**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **CLYDE SCOFIELD, et al.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:07-cv-579-MEF** |
| | ) | |
| **CITY OF FLORALA, ALABAMA,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

The City of Florala, Alabama, and Officer Neil Pittman submit this memorandum in support of their Motion for Summary Judgment.

## I. INTRODUCTION

This lawsuit arose from a police chase of a wanted felon on Saturday, June 25, 2005. (See Compl. at 2, ¶ 7, and at 6, ¶ 29.)

### A. *The Parties*

The plaintiffs are Clyde Scofield, Tina Scofield, Robert Hobby, and Penny Copley. (See Compl. at 1-2, ¶ 6.) Robert Hobby is Tina Scofield's and Penny Copley's father. (See Compl. at 1-2, ¶ 6.) Clyde Scofield is Tina Scofield's husband. (See Compl. at 1-2, ¶ 6.)

The defendants are the City of Florala and one its police officers, Neil Pittman. (See Compl. at 1, ¶¶ 2-3.)

1

The incident occurred after Officer Pittman's police car crashed during the pursuit. (See Compl. at 2, ¶ 7.) Officers Tim Snow and Mike Abraham, who had been riding with Officer Pittman, directed Mrs. Scofield to drive them to an area where the pursuit ended and the suspect was at large. (See Compl. at 2, ¶ 8.) Ms. Copley rode with Mrs. Scofield and Officers Snow and Abraham. (See Compl. at 2, ¶ 7.) Mr. Scofield and Mr. Hobby remained behind at the roadside. (See Compl. at 2, ¶ 7.)

Officer Pittman also stayed behind with his wrecked patrol car. (See Compl. at 2, ¶ 9.)

Robert Hobby and Clyde Scofield initiated an altercation with Officer Pittman beside the wrecked patrol car. (See Compl. at 2, ¶ 9.) The altercation resulted in Robert Hobby's and Clyde Scofield's arrest. (See Compl. at 2, ¶ 9.)

## B. The Plaintiffs' Claims

The Complaint contains six counts. (See Compl. at 3-7.) Count One alleges Officer Pittman violated Mr. Scofield's and Mr. Hobby's Fourth Amendment rights by using excessive force against them. (See Compl. at 3, ¶¶ 12-16.)

Count Two alleges Officer Pittman and the City of Florala committed a common-law battery against Mr. Scofield and Mr. Hobby. (See Compl. at 3-4, ¶¶ 16-18.)

Count Three alleges that other, unidentified officers of the City falsely imprisoned Mrs. Scofield and Ms. Copley and that the City is liable. (See Compl. at 4, ¶¶ 19-20.)

Count Four alleges the City negligently, wantonly or willfully hired, trained, supervised, and retained Officer Pittman and thereby damaged Mr. Scofield and Mr. Hobby.  (See Compl. at 4-5, ¶¶ 21-25.)

Count Five alleges the City violated Mr. Hobby's First, Fourth, Eighth, and Fourteenth Amendment rights through a municipal policy or custom because the City had no formal policy for commandeering vehicles.  (See Compl. at 5-6, ¶¶ 26-30.)

Count Six alleges the City violated Mr. Scofield's and Mr. Hobby's First, Fourth, Eighth and Fourteenth Amendment rights by maintaining "an official policy to perform arrests of individuals who voice opposition and challenge police action or authority; and further to effectuate the arrest with an amount of force excessive and intended to punish those who may question police authority."  (See Compl. at 6-7, ¶¶ 31-33 and 29.)

## C.  The Defendants' Responses

Officer Pittman and the City emphatically deny the Complaint's allegations. Officer Pittman invokes the defense of qualified immunity against the plaintiffs' federal claims.    See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) ("governmental officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known").

Officer Pittman and the City both invoke the state law defense of State-agent immunity.  <u>See</u> Ala. Code § 6-5-338 (1975) (establishing State-agent immunity for police officers and their municipal employers).

The City also invokes the state law defense of municipal immunity.  <u>See</u> Ala. Code § 11-47-190 (1975) (establishing municipal immunity from claims that allege intentional acts).

The City also invokes its immunity to punitive damages under state and federal law.  <u>See</u> <u>City of Newport v. Fact Concerts, Inc.</u>, 453. U.S. 247, 271 (1981); Ala. Code § 6-11-26 (1975).

As more fully explained in Sections III and IV, <u>infra</u>, Officer Pittman and the City of Florala move for summary judgment as to all claims by all plaintiffs.

## II. <u>SUMMARY OF THE UNDISPUTED FACTS[1]</u>

On Saturday, June 25, 2005, the plaintiffs decided to travel to Brewton for lunch.  (<u>See</u> T. Scofield dep. at 36:4-8.)  They were riding in a white Nissan Xterra.  (<u>See</u> Copley dep. at 45:12-16.)

Tina Scofield was driving.  (<u>See</u> T. Scofield dep. at 57:18-19.)  Her sister Penny Copley was in the front passenger seat.  (<u>See</u> T. Scofield dep. at 58:3-5.)  Tina Scofield's husband, Clyde Scofield, and father, Robert Hobby were riding in the back.  (<u>See</u> C. Scofield dep. at 65:3-4.)

Their route took them along County Road 4, which crossed the Yellow River bridge.  (<u>See</u> T. Scofield dep. at 36:8-9.)  They were traveling west.  (<u>See</u> T.

---

[1] The facts are undisputed only for purposes of the Motion for Summary Judgment.  The actual facts are different from the plaintiffs' version of events, which is presented in this motion.

Scofield dep. at 59:1-3.)  They were unaware that a police chase was in progress nearby.  (See C. Scofield dep. at 72:14-16.)

### A. Use of the Plaintiffs' Vehicle

As the plaintiffs reached the Yellow River bridge, Florala Police Officers Tim Snow and Mike Abraham flagged them down by waving their arms.  (See C. Scofield dep. at 74:3-11, 76:22 to 77:2.)

A third officer, defendant Neil Pittman, was sitting in a patrol car trying to get it unstuck.  (See C. Scofield dep. at 74:12-19.)  Officer Pittman's car was on a dirt fishing road that led to the river at a lower elevation.  (See C. Scofield dep. at 75:3-14, 89:20.)  There was a steep drop-off between County Road 4 and the dirt road where Officer Pittman's car was stuck.  (See C. Scofield dep. at 75:9-14.)

Officer Pittman was nowhere near the location where Officers Snow and Abraham flagged down the plaintiffs.  (See C. Scofield dep. at 76:10-15.)  Officer Pittman was not involved in flagging down the plaintiffs.  (See C. Scofield dep. at 76:16-21, 99:2-4.)

Officer Pittman was inside his patrol car revving up the motor, slamming the car into drive, and slamming it into reverse in an effort to free it.  (See C. Scofield dep. at 100:6-18, 106:10-14.)

The only two officers involved in flagging down the plaintiffs were Officers Snow and Abraham.  (See C. Scofield dep. at 76:22 to 77:2.)

Back up at the road, Officer Snow did the talking.  (See C. Scofield dep. at 77:3-5.)  Officer Snow explained that he and Officer Abraham needed to confiscate the plaintiffs' vehicle. (See Copley dep. at 42:11-12.)

Officer Snow directed Mr. Scofield and Mr. Hobby to exit the vehicle. (<u>See</u> C. Scofield dep. at 77:15.) They complied. (<u>See</u> C. Scofield dep. at 77:20-23.) Officer Snow and Officer Abraham got in the back seat and shouted, "Go, go, go." (<u>See</u> C. Scofield dep. at 80:2-5; Copley dep. at 42:14-15.) According to Mrs. Scofield, Officer Snow intended for her to drive him to another location. (<u>See</u> T. Scofield dep. at 151:15-17.)

Ms. Copley was trying to exit the vehicle as the officers got in, but Mrs. Scofield accelerated so suddenly that she caused Ms. Copley's door to close. (<u>See</u> Copley dep. at 46:21-23.)

Neither officer physically held Ms. Copley in the vehicle or ordered her to remain. (<u>See</u> Copley dep. at 47:2 to 48:12.) Neither officer ordered Mrs. Scofield to remain. (<u>See</u> Copley dep. at 48:13-15.) The officers simply jumped in the back seat and shouted, "Go, Go, Go." (<u>See</u> Copley dep. at 48:16-18.)

Neither Mrs. Scofield nor Ms. Copley ever protested that they wanted out of the vehicle, or that they did not want to transport the officers. (<u>See</u> Copley dep. at 48:22 to 49:20.)

Under Alabama law, a citizen is legally obligated to aid a peace officer who is trying to effect a lawful arrest:

(a) A person commits the crime of refusing to aid a peace officer if, upon command by a peace officer identified to him as such, he fails or refuses to aid such peace officer in:

(1) Effecting or securing a lawful arrest; or

(2) Preventing the commission by another person of any offense.

6

(b) A person is not liable under this section if the failure or refusal to aid the officer was reasonable under the circumstances. The burden of injecting this issue is on the defendant, but this does not shift the burden of proof.

(c) Refusing to aid a peace officer is a Class C misdemeanor.

Ala. Code § 13A-10-5 (1975).

Officers Snow and Abraham never threatened Mrs. Scofield or Ms. Copley. (See Copley dep. at 50:1-3, 50:17-22.)  Officers Snow and Abraham did not keep the plaintiffs' vehicle.  (See Copley dep. at 50:4-6, 50:23 to 51:2.)  Officers Snow and Abraham simply directed Mrs. Scofield and Ms. Copley to transport them to the place where the car chase had terminated.  (See Copley dep. at 51:3-8.)

For his part, Officer Pittman never approached the plaintiffs' vehicle.  (See T. Scofield dep. at 62:5-7.)  Officer Pittman never said anything about taking the plaintiffs' vehicle.  (See T. Scofield dep. at 62:8-9.)  Officer Pittman was not involved in using the plaintiffs' vehicle.  (See C. Scofield dep. at 76:16-19, 82:5-11; T. Scofield dep. at 62:13-18; Copley dep. at 45:22 to 46:1.)

Mrs. Scofield drove Officers Snow and Abraham down a dirt road named "Walker Road," which ran off County Road 4.  (See T. Scofield dep. at 63:6-8; C. Scofield dep. at 92:10-12, 92:23 to 93:3.)

While Officers Snow and Abraham rode in the back of the plaintiffs' vehicle, they learned that the suspect had been apprehended.  (See Copley dep. at 43:9-10, 51:11-13.)  By the time Officers Snow and Abraham arrived at their destination on Walker Road, the suspect was in custody.  (See Copley dep. at 51:9-10.)

Mrs. Scofield and Ms. Copley were never actually in the presence of the suspect while he was at large.  (See Copley dep. at 52:17-20.)  As soon as Mrs. Scofield and Ms. Copley dropped off Officers Snow and Abraham, the officers sent them back to pick up Mr. Scofield and Mr. Hobby.  (See Copley dep. at 55:3-5.)

All the officers asked Mrs. Scofield and Ms. Copley to do was transport them to the area on Walker Road where the pursuit ended, so the officers could try to capture the suspect.  (See Copley dep. at 55:18-23.)  The entire trip covered no more than a mile and a half.  (See T. Scofield dep. at 64:14-18.)  The entire trip lasted sixty to ninety seconds.  (See T. Scofield dep. at 65:2-4.)

**B. *The Altercation Involving Officer Pittman***

Back on County Road 4, Mr. Scofield and Mr. Hobby began walking down the hill from County Road 4 to the fishing road where Officer Pittman's car was stuck.  (See C. Scofield dep. at 81:16-18.)  As they walked, Officer Pittman freed his car.  (See C. Scofield dep. at 81:16-17.)  Officer Pittman drove his car over to Walker Road.  (See C. Scofield dep. at 96:14-19.)

Defendant's Exhibit 7 to Clyde Scofield's deposition depicts the layout of the area.  (See C. Scofield dep. at 95:4-7.)  It depicts County Road 4, the Yellow River bridge, the fishing road, and Walker Road.  (See C. Scofield dep. at 89:13 to 97:2.)

Officer Pittman was standing beside the trunk of his patrol car.  (See C. Scofield dep. at 151:1-4.)  The trunk was open.  (See C. Scofield dep. at 153:1-4, 153:9-13.)

Until this point, Officer Pittman had been preoccupied with his stuck car. (See C. Scofield dep. at 100:6-18, 106:10-14.)  Officer Pittman could not have known who Mr. Scofield and Mr. Hobby were, where they came from, or why they were addressing him.  (See C. Scofield dep. at 106:15 to 108:3.)

Mr. Scofield addressed Officer Pittman first.  (See C. Scofield dep. at 83:21 to 84:6, 84:15-17.)  Referring to Walker Road, Mr. Scofield told Officer Pittman, "You know the Florida line is right down there."  (See C. Scofield dep. at 56:18-19.)

According to Mr. Scofield, Officer Pittman "told me it was none of my fucking business where the state line was.  They was chasing a fugitive, and it didn't matter how far they had to go.  They was catching the son of a bitch and bringing him back."  (C. Scofield dep. at 87:3-7.)

After that exchange, Mr. Scofield struck up a conversation with a bystander on Walker Road.  (See C. Scofield dep. at 115:21-23.)

Mr. Hobby then weighed in.  According to Mr. Scofield, Mr. Hobby told Officer Pittman, "that that was his truck and that it was some of his [fucking] business because his daughters was in the truck, and my wife was one of them." (C. Scofield dep. at 121:4-13, 147:5-10.)

Mr. Hobby's confrontation with Officer Pittman interrupted Mr. Scofield's conversation with the bystander.  (See C. Scofield dep. at 115:21 to 116:9, 124:2-11.)

Mr. Hobby was standing five feet away from Officer Pittman and holding a cane in his left hand. (<u>See</u> C. Scofield dep. at 88:2-4, 109:20 to 110:2, 149:16-19.)

Officer Pittman cautioned Mr. Hobby that he could be arrested. (<u>See</u> C. Scofield at 164:3-8.) Mr. Hobby told Officer Pittman, "You're not going to fucking arrest me." (<u>See</u> C. Scofield dep. at 154:10-19, 167:12-14.)

Officer Pittman reached to grab Mr. Hobby's arm, and Mr. Hobby snatched it away. (<u>See</u> C. Scofield dep. at 112:9-14, 161:15-18, 166:15-18.)

Mrs. Scofield and Ms. Copley arrived back at County Road 4 around this time. (<u>See</u> T. Scofield dep. at 72:4-21.) Mrs. Scofield saw Officer Pittman and Mr. Hobby struggle for control of Mr. Hobby's cane. (<u>See</u> T. Scofield dep. at 72:4-21, 75:15 to 76:6.) Mrs. Scofield also saw the cane strike Officer Pittman on his leg. (<u>See</u> T. Scofield dep. at 73:10 to 74:3.) Officer Pittman had to forcefully wrestle the cane away from Mr. Hobby. (<u>See</u> T. Scofield dep. at 76:20 to 77:3.)

While Officer Pittman and Mr. Hobby struggled for control of the cane, Mr. Scofield began to advance on Officer Pittman at a fast pace. (<u>See</u> T. Scofield dep. at 79:2-15.) Mr. Scofield was also holding a cane. (<u>See</u> C. Scofield dep. at 109:14-15, 131:22 to 132:5, 149:20-22, 149:23 to 150:9.) Officer Pittman was alone and outnumbered. (<u>See</u> C. Scofield dep. at 209:5-11.) Officer Pittman was smaller than Mr. Scofield. (<u>See</u> C. Scofield dep. at 235:19-23.)

As Mr. Scofield closed on Officer Pittman, Officer Pittman grabbed Mr. Hobby by his shirt and slung him in the open car trunk. (<u>See</u> T. Scofield dep. at 79:22 to 80:1.) Mrs. Scofield testified, "It appeared [Officer Pittman] was choking

10

[Robert], but I believe he was holding him." (<u>See</u> T. Scofield dep. at 101:7-9.)  At another point, she testified, Officer Pittman was "holding my father in the trunk." (<u>See</u> T. Scofield dep. at 80:3.)

As Officer Pittman held Mr. Hobby in the open trunk, Mr. Scofield wrapped his arms around Officer Pittman and pulled him away from Mr. Hobby. (<u>See</u> T. Scofield dep. at 80:2-6.)

Officer Pittman spun around, handcuffed Mr. Scofield, and slung him into the trunk on top of Mr. Hobby. (<u>See</u> T. Scofield dep. at 80:7-9.)  Officer Pittman then placed Mr. Scofield in the back of the patrol car. (<u>See</u> C. Scofield dep. at 186:10-19.)

Officer Pittman never displayed any weapon or used any force other than his bare hands. (<u>See</u> C. Scofield dep. at 196:2 to 197:5, 209:13 to 210:4.)  Officer Pittman never even handcuffed Mr. Hobby. (<u>See</u> C. Scofield dep. at 197:18-20.)

Inside the patrol car, Mr. Scofield had a seizure. (<u>See</u> C. Scofield dep. at 197:21 to 198:2.)  An ambulance was called to check both men. (<u>See</u> C. Scofield dep. at 200:2-7.)

Mr. Scofield and Mr. Hobby were both taken to the hospital for checkups before they were taken to jail. (<u>See</u> C. Scofield dep. at 200:5 to 201:6.)  Mr. Scofield's medical treatment consisted of two Tylenol pills and a cup of water. (<u>See</u> C. Scofield dep. at 212:4-7.)

Mr. Scofield has no reason to believe Officer Pittman harbored any malice, ill will, or animosity toward him or Mr. Hobby. (<u>See</u> C. Scofield dep. at 71:6-11.)

Officer Pittman never laid a hand on Mrs. Scofield or Ms. Copley. (See T. Scofield dep. at 83:21-23.)

## C. *Other Matters*

It is undisputed that Officer Pittman was working as a police officer for the City of Florala at the time of the incident. (See Compl. at 1, ¶ 3; Ans. at 1, ¶ 3.) Officers Snow and Abraham have not been sued. (See Compl. at 1-7.)

The plaintiffs have not conducted any discovery or uncovered any evidence to support their claim for negligent, wanton or willful hiring, training, retention and supervision.

They also have not conducted any discovery or uncovered any evidence to support their federal municipal liability claims, which allege unconstitutional policies and customs.

## III.  ISSUES AND SHORT ANSWERS

1. **Count One: Fourth Amendment Excessive Force by Mr. Scofield and Mr. Hobby**

   a.    Is there substantial evidence that Officer Pittman violated clearly established law, as required to deny him qualified immunity against Mr. Scofield's and Mr. Hobby's Fourth Amendment excessive force claim?  No.  Officer Pittman is entitled to qualified immunity against the Fourth Amendment excessive force claim.

2. **Count Two: State Law Battery by Mr. Scofield and Mr. Hobby**

   a.    Does the Complaint state a claim against Officer Pittman and the City of Florala for common law battery?  No, the complaint does not sufficiently allege battery so as to overcome the

State-agent immunity defense, because it does not allege that Officer Pittman acted willfully, maliciously, fraudulently, in bad faith, beyond his authority, or under a mistaken interpretation of law. Accordingly, Officer Pittman and the City of Florala are entitled to State-agent immunity against the battery claim.

b. Is there substantial evidence that Officer Pittman acted willfully, maliciously, fraudulently, in bad faith, beyond his authority, or under a mistaken interpretation of law, as required to deny him and the City of Florala State-agent immunity?  No, there is no evidence of any of these.  Officer Pittman and the City of Florala are entitled to State-agent immunity against the battery claim.

c. Even if Mr. Scofield and Mr. Hobby could establish that Officer Pittman's conduct fell within one of the exceptions to State-agent immunity, could they recover from the City of Florala?  No. Under Code of Alabama section 11-47-190 (1975), their claim against the City of Florala would still be barred by immunity.

d. May Mr. Scofield and Mr. Hobby recover punitive damages from the City of Florala?  No.  The City of Florala has immunity from the punitive damage claim under state law.

**3.   Count Three: False Imprisonment by Mrs. Scofield and Ms. Copley**

a. Is there substantial evidence that Mrs. Scofield and Ms. Copley were held unlawfully?  No.  Under Code of Alabama section

13

13A-10-5, Mrs. Scofield and Ms. Copley had a legal duty to aid the officers.

b.    Is there substantial evidence that Officers Snow or Abraham acted willfully, maliciously, fraudulently, in bad faith, beyond their authority, or under a mistaken interpretation of law, as required to deny the City of Florala State-agent immunity?  No, there is no evidence of any of these.  The City of Florala is entitled to State-agent immunity against the false imprisonment claim.

c.    Even if the plaintiffs could show malice or willful misconduct, could Mrs. Scofield and Ms. Copley maintain a claim against the City of Florala for false imprisonment?  No.  By statute, the City of Florala has immunity for malicious and willful misconduct by employees.  See Ala. Code § 11-47-190 (1975).

d.    May Mrs. Scofield and Ms. Copley recover punitive damages from the City of Florala?  No.  The City of Florala has immunity from the punitive damages claim under state law.

**4.    Count Four: Negligent, Wanton or Willful Hiring, Training, Supervision, or Retention Claims by Mr. Scofield and Mr. Hobby**

a.    May a plaintiff maintain a claim against a municipality for the negligence of a police officer?  No.  By statute, the City of Florala has immunity against claims for negligence, outside the context of a claim for a defect in a public premises.  See Ala. Code § 11-47-190 (1975).

b.     May the City of Florala be liable for wantonness or willfulness?   No.   By statute, the City of Florala has immunity against claims of wantonness and willfulness.   <u>See</u> Ala. Code § 11-47-190 (1975).

c.     Is there substantial evidence of negligent hiring, training, supervision, or retention?   No.   The plaintiffs have not conducted discovery on these issues.   There is no evidence of these whatsoever.

d.     May Mr. Scofield and Mr. Hobby recover punitive damages from the City of Florala?   No.   The City of Florala has immunity from punitive damages claims under state law.

## 5.     Count Five: First, Fourth, Eighth and Fourteenth Amendment Claims by Mr. Hobby against the City of Florala

a.     Does Count Five state a claim for violation of one of Mr. Hobby's constitutional rights?   No.   Count Five does not identify any specific constitutional right that was allegedly violated.

b.     Is there substantial evidence of an unconstitutional municipal policy or custom that was the moving force behind any alleged constitutional violation in this case?   No.   The City of Florala is entitled to summary judgment on the municipal liability claim in Count Five.   There is a complete absence of proof on this issue.

c.     May Mr. Hobby recover punitive damages from the City of Florala under federal law?   No.   Under federal law, punitive damages may not be recovered from a municipality.

6. **Count Six: First, Fourth, Eighth and Fourteenth Amendment Claims by Mr. Hobby and Mr. Scofield against the City of Florala**

a. Does Count Six state a claim for violation of one of Mr. Scofield's and Mr. Hobby's constitutional rights? No. Count Six does not identify any specific constitutional right that was allegedly violated.

b. Is there substantial evidence of an unconstitutional municipal policy or custom that was the moving force behind any alleged constitutional violation in this case? No. The City of Florala is entitled to summary judgment on the municipal liability claim in Count Six. There is a complete absence of proof on this issue.

c. May Mr. Hobby and Mr. Scofield recover punitive damages from the City of Florala under federal law? No. Under federal law, punitive damages may not be recovered from a municipality.

## IV. <u>ANALYSIS</u>

### A. *Summary Judgment Standard*

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment: "A party against whom a claim … is asserted … may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof."

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c).

According to the Supreme Court, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed. R. Civ. P. 56(e).

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

> Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986).

As the analysis that follows demonstrates, the City of Florala and Officer Pittman are entitled to summary judgment on all claims.

## B. Count One: The Fourth Amendment Excessive Force Claim

Count One states a claim against Officer Pittman for using excessive force against Mr. Scofield and Mr. Hobby in violation of their Fourth Amendment rights:

12.    Plaintiffs, Clyde Scofield and Robert Hobby, incorporate the factual averments of paragraphs six through eleven;

13.    The Fourth Amendment encompasses the right to be free from the use of excessive force in the course of an arrest;

14.    The degree of force used by Pittman in the arrest of Clyde Scofield and Robert Hobby was plainly excessive, wholly unnecessary and grossly disproportionate under the circumstances and violates the Plaintiffs' Fourth Amendment rights;

15.    Pittman's conduct violated clearly established law;

16.    As a proximate consequence of the violation, Clyde Scofield and Robert Hobby suffered physical injuries, medical bills, emotional distress and mental anguish

WHEREFORE, Plaintiffs, Clyde Hobby [sic] and Robert Hobby, demand judgment against Neil Pittman in an amount to be determined by the jury plus attorney's fees and costs; and for such further relief as the Plaintiffs may be entitled.

(Compl. at 3, ¶¶ 12-16.)

Officer Pittman invokes the qualified immunity defense against the Fourth Amendment excessive force claim in Count One.  (<u>See</u> Ans. at 5, 5th Defense.)

### 1. The Qualified Immunity Defense

"Government officials sued for acts committed in the course of their official duties may invoke the defense of qualified immunity." O'Rourke v. Hayes, 378 F.3d 1201, 1205 (11th Cir. 2004). "The purpose of qualified immunity is to ensure that officials are not deterred or distracted from carrying out their official duties because of fear of a later lawsuit." Robinson v. Arrugueta, 415 F.3d 1252, 1257 n.5 (11th Cir. 2005).

"A governmental official who is sued under § 1983 may seek summary judgment on the ground that he is entitled to qualified immunity." Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir. 2004).

"The qualified immunity inquiry involves three steps: (1) the alleged conduct must fall within the scope of the discretionary authority of the actor; (2) if it does, we must then determine whether that conduct violates a constitutional right; (3) if so, we must inquire whether the asserted right was clearly established at the time of the alleged violation." Tinker v. Beasley, 429 F.3d 1324, 1326 (11th Cir. 2005).

### a. Discretionary Function

"To be eligible for qualified immunity, the official must first establish that he was performing a 'discretionary function' at the time the alleged violation of federal law occurred." Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir. 2004).

"To determine whether an official was engaged in a discretionary function, we consider whether the acts the official undertook 'are of a type that fell within

the employee's job responsibilities.'" Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir. 2004) (quoting Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004)).

"In considering whether an act of allegedly excessive force fell within a police officer's duties, for example, we do not ask whether police have the right to use excessive force. We also do not immediately jump to a high level of generality and ask whether police are responsible for enforcing the law or promoting the public interest. We instead ask whether they have the power to attempt to effectuate arrests." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1266 (11th Cir. 2004).

### b. Burden Shift

"If the official was acting within the scope of his discretionary authority, the burden shifts to the plaintiff." McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir. Apr. 11, 2007). "To defeat summary judgment because of a dispute of material fact, a plaintiff facing qualified immunity must produce evidence that would allow a fact-finder to find that no reasonable person in the defendant's position could have thought the facts were such that they justified defendant's acts." Post v. City of Ft. Lauderdale, 7 F.3d 1552, 1557 (11th Cir. 1993).

### c. Two-Part Test

"To determine whether an officer is entitled to qualified immunity, we engage in a two-step analysis." Garrett v. Athens-Clarke County, 378 F.3d 1274, 1278 (11th Cir. 2004).

"The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation." Hope v. Pelzer, 536 U.S. 730, 736 (2002).

"If the conduct did not violate a constitutional right, the inquiry ends there." Robinson v. Arrugueta, 415 F.3d 1252, 1255 (11th Cir. 2005). "[I]f a defendant has not violated the law at all, he certainly has not violated clearly established law." Hudson v. Hall, 231 F.3d 1289, 1294 (11th Cir. 2000).

"However, if a constitutional violation can be made out on the plaintiff's facts, we then must determine 'whether, at the time of the incident, every objectively reasonable police officer would have realized the acts violated already clearly established federal law.'" Davis v. Williams, 451 F.3d 759, 762 (11th Cir. 2006) (quoting Garrett v. Athens-Clarke County, 378 F.3d 1274, 1278-78 (11th Cir. 2004)).

At this stage, "the plaintiff bears the burden of demonstrating that the official is not entitled to qualified immunity." Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir. 2004).

### 2. *Qualified Immunity Analysis*

In this case, it is undisputed that Neil Pittman was acting as a police officer and effectuating an arrest during the incident. (See Compl. at 1, ¶ 3, at 2, ¶ 9, and at 3, ¶ 17.)

Therefore, the burden shifts to Mr. Scofield and Mr. Hobby to identify facts that demonstrate a violation of clearly established law. See Harris v. Coweta County, 406 F.3d 1307, 1312-23 (11th Cir. 2005) ("The defendants having

established their eligibility for qualified immunity, the burden then shifts to the plaintiff to show that qualified immunity is not appropriate.").

### a.  The Initial Arrest

The undisputed facts show that after Officer Pittman's exchange with Mr. Scofield, Mr. Hobby approached to within five feet of Officer Pittman holding a cane and directed profanity toward him at sufficient volume to interrupt Mr. Scofield's conversation with the bystander.   (See C. Scofield dep. at 88:2-4, 109:20 to 110:2, 115:21 to 116:9, 124:1-11, 149:16-19.)

The Alabama Criminal Code defines the crime of Disorderly Conduct as follows:

> (a) A person commits the crime of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:
>
>> (1) Engages in fighting or in violent tumultuous or threatening behavior; or
>>
>> (2) Makes unreasonable noise; or
>>
>> (3) In a public place uses abusive or obscene language or makes an obscene gesture; or
>>
>> (4) Without lawful authority, disturbs any lawful assembly or meeting of persons; or
>>
>> (5) Obstructs vehicular or pedestrian traffic, or a transportation facility; or
>>
>> (6) Congregates with other person in a public place and refuses to comply with a lawful order of the police to disperse.
>
> (b) Disorderly conduct is a Class C misdemeanor.

Ala. Code § 13A-11-7 (1975).

"An arrest does not violate the Fourth Amendment if a police officer has probable cause for the arrest." Wood v. Kesler, 323 F.3d 872, 878 (11th Cir. 2003). "Probable cause to arrest exists if the facts and circumstances within the officer's knowledge, of which he has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed or is committing an offense." Ortega v. Christian, 85 F.3d 1521, 1525 (11th Cir. 1996).

In this case, Officer Pittman has raised qualified immunity as a defense. (See Ans. at 5, 5th Defense.) "To receive qualified immunity protection, an officer need not have actual probable cause but only arguable probable cause." Wood v. Kesler, 323 F.3d 872, 878 (11th Cir. 2003).

Again, the burden lies with the plaintiffs. The plaintiffs "must demonstrate that no reasonable officer could have found probable cause under the totality of the circumstances." Kingsland v. City of Miami, 382 F.3d 1220, 1232 (11th Cir. 2004).

"Arguable probable cause exists if, under all of the facts and circumstances, an officer reasonably could – not necessarily would – have believed that probable cause was present." Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir. 2004).

"Arguable probable cause does not require an arresting officer to prove every element of a crime or to obtain a confession before making an arrest, which would negate the concept of probable cause and transform arresting officers into prosecutors." Scarbrough v. Myles, 245 F.3d 1299, 1302-03 (11th Cir. 2001).

"Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." <u>Hunter v. Bryant</u>, 502 U.S. 224, 227 (1991).

In this case, the undisputed facts could give a reasonable police officer arguable probable cause to believe Mr. Hobby committed the crime of Disorderly Conduct. Specifically, Mr. Hobby directed his comments at Officer Pittman at sufficient volume and under such circumstances as to interrupt Mr. Scofield's conversation with the bystander. Moreover, coupled with the fact that Mr. Hobby had closed to within five feet of Officer Pittman while holding a cane, a reasonable officer could have believed that Mr. Hobby's statements amounted to fighting words.

Under the Alabama Court of Criminal Appeals' opinion in <u>Smith v. City of Anniston</u>, a reasonable police officer could have believed there was probable cause to arrest Mr. Hobby for Disorderly Conduct. 668 So. 2d 96 (Ala. Crim. App. 1995).

In <u>Smith</u>, the defendant told a police officer to, "Suck my dick" in front of bystanders. <u>Id.</u> at 96. The officer arrested the defendant for Disorderly Conduct. <u>Id.</u> At trial, the defendant challenged the sufficiency of the evidence. The Alabama Court of Criminal Appeals held there was sufficient evidence to support the jury's verdict:

> [I]n the present case other individuals heard the abusive language in addition to the police officer. The commentary to § 13A-11-7, Code of Alabama, 1975, makes it clear that this statute is designed "to protect the public from being annoyed, inconvenienced or alarmed." This section "encompasses the common law offenses of breach of the peace and disturbing the peace." Id. While it is clear that the

24

statute requires that the offender intend to cause public inconvenience, annoyance, or alarm, or that the offender recklessly creates a risk thereof, such questions of intent are generally matters for the finders of fact. In the present case, because the appellant made the offensive comment, not only to the police officer, but also in the presence of other individuals who could hear and react, whether his conduct amounted to disorderly conduct was a question of fact for the jury.

Smith, 668 So. 2d at 98.

The facts of this case exceed those in Smith. In Smith, the arrestee merely directed profanity at the officer in the presence of others. In this case, Mr. Hobby was also holding a cane and had advanced to within five feet of Officer Pittman. Under these circumstances, Officer Pittman had arguable probable cause to arrest Mr. Hobby for Disorderly Conduct.

### b. The Use of Force

It is also undisputed that Mr. Hobby and Mr. Scofield actively resisted Mr. Hobby's arrest. Mr. Scofield testified that when Officer Pittman reached for Mr. Hobby's arm, Mr. Hobby snatched his arm away. (See C. Scofield dep. at 112:9-14, 161:15-18, 166:15-18.) Mrs. Scofield saw Mr. Hobby struggle with Officer Pittman for control of the cane. (See T. Scofield dep. at 72:4-21, 75:15 to 76:6.) Mrs. Scofield saw the cane strike Officer Pittman on his leg. (See T. Scofield dep. at 73:10 to 74:3.) Officer Pittman had to forcefully wrestle the cane away from Mr. Hobby. (See T. Scofield dep. at 76:20 to 77:3.)

Mrs. Scofield further testified that during Officer Pittman's struggle with Mr. Hobby, Mr. Scofield began to advance on Officer Pittman at a brisk pace. (See T. Scofield dep. at 79:2-15.) Mr. Scofield was also armed with a cane. (See C. Scofield dep. at 109:14-15.)

25

As Mr. Scofield closed on Officer Pittman, Officer Pittman slung Mr. Hobby into the open car trunk and held him there.  (<u>See</u> T. Scofield dep. at 79:22 to 80:3, 101:7-9.)

Mr. Scofield physically grabbed Officer Pittman and pulled him away from Mr. Hobby.  (<u>See</u> T. Scofield dep. at 80:2-6.)  Officer Pittman spun around, handcuffed Mr. Scofield, and slung him into the trunk on top of Mr. Hobby.  (<u>See</u> T. Scofield dep. at 80:7-9.)  Officer Pittman then placed Mr. Scofield in the back seat of the patrol car.  (<u>See</u> C. Scofield dep. at 186:10-19.)

Officer Pittman never drew any weapon or used any force other than his bare hands.  (<u>See</u> C. Scofield dep. at 196:2 to 197:5, 209:13 to 210:14.)  Officer Pittman never even handcuffed Mr. Hobby.  (<u>See</u> C. Scofield dep. at 197:18-20.)

Both Mr. Scofield and Mr. Hobby were taken to a hospital for evaluation before they were taken to jail.  (<u>See</u> C. Scofield dep. at 200:5 to 201:6.)  There is no evidence of permanent injury to either man.

"Excessive force claims, like most other Fourth Amendment issues, are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred."  <u>Saucier v. Katz</u>, 533 U.S. 194, 207 (2001).

"In analyzing whether excessive force was used, courts must look at the totality of the circumstances."  <u>Garrett v. Athens-Clarke County</u>, 378 F.3d 1274, 1280 (11th Cir. 2004).  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989).

"Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment.  The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."  Graham v. Connor, 490 U.S. 386, 396-97 (1989) (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2nd Cir. 1973)).

"If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed."  Saucier v. Katz, 533 U.S. 194, 205 (2001).

"Government officials are not required to err on the side of caution."  Marsh v. Butler County, 268 F.3d 1014, 1030 n.8 (11th Cir. 2001) (en banc).  "Reconsideration will nearly always reveal that something different could have been done if the officer knew the future before it occurred.  This is what we mean when we say we refuse to second-guess the officer."  Carr v. Tatangelo, 338 F.3d 1259, 1270 (11th Cir. 2003) (citation omitted).

"All the Constitution requires is that the force used be objectively reasonable, not that it be the absolute minimum necessary."  Harrell v. Decatur County, 22 F.3d 1570, 1579 n.1 (11th Cir. 1994) (Dubina J., dissenting), *majority opinion vacated and dissenting opinion adopted*, 41 F.3d 1494 (11th Cir. 1995).

"[Q]ualified immunity is appropriate in close cases where a reasonable officer could have believed that his actions were lawful."  Lee v. Ferraro, 284 F.3d 1188, 1200 (11th Cir. 2002).

In this case, Officer Pittman was confronted by two men armed with canes who actively resisted a lawful arrest.

In <u>Davis v. State</u>, 470 So.2d 1340, 1341-42 (Ala. Crim. App. 1985), the Alabama Court of Criminal Appeals acknowledged that, "Alabama courts have held that a club or stick can be considered a deadly weapon."

Mr. Scofield and Mr. Hobby have the burden to demonstrate that Officer Pittman violated clearly established law when he slung them into the open car trunk and physically restrained them with his hands. They cannot meet that burden.

Officer Pittman's use of force was not only plainly lawful, but also falls within the *de minimis* force doctrine. "The application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." <u>Nolin v. Isbell</u>, 207 F.3d 1253, 1257 (11th Cir. 2000).

In <u>Jones v. City of Dothan</u>, 121 F.3d 1456, 1458 (11th Cir. 1997), the Eleventh Circuit held force did not rise to level of a Fourth Amendment violation when an officer allegedly "slammed" the plaintiff against a wall, kicked his legs apart, and required him to raise his hands above his head. The plaintiff in <u>Jones</u> required medical treatment and was not arrested. <u>Id.</u> at 1459-60.

In <u>Post v. City of Ft. Lauderdale</u>, 7 F.3d 1552, 1559-60 (11th Cir. 1993), the Eleventh Circuit held force did not rise to level of a Fourth Amendment violation when the officer allegedly pushed the plaintiff into a wall. The court held, "even though pushing Lirio against the wall might have been unnecessary, this pushing was not plainly unlawful." <u>Id.</u>

In Gold v. City of Miami, 121 F.3d 1442, 1446 (11th Cir. 1997), the Eleventh Circuit held force did not rise to level of a Fourth Amendment violation when the suspect allegedly experienced pain from handcuffs for twenty minutes and skin abrasions for which he did not seek medical treatment.

In Rodriguez v. Farrell, 280 F.3d 1341, 1352 (11th Cir. 2002), the Eleventh Circuit held, "Painful handcuffing, without more, is not excessive force in cases where the resulting injuries are minimal."

In Durruthy v. Pastor, 351 F.3d 1080 (11th Cir. 2003), the Eleventh Circuit granted qualified immunity because the level of force was de minimis when the officer kneed the suspect in his back during handcuffing.

Under the undisputed facts, Mr. Scofield and Mr. Hobby cannot meet their burden to prove a violation of clearly established law.   Accordingly, Officer Pittman is entitled to qualified immunity against the Fourth Amendment excessive force claim in Count One.   Officer Pittman therefore moves for summary judgment on Count One.

## C.  Count Two: The State Law Battery Claim

Count Two purportedly states a claim against Officer Pittman and the City of Florala for battery against Mr. Scofield and Mr. Hobby under state law:

16.    Plaintiffs, Clyde Scofield and Robert Hobby, incorporate the factual averments of paragraphs six through 11;

17.    That on or about June 25, 2005, Defendant, Neil Pittman, while acting within the line and scope of his employment as a police officer for the town of Florala, committed a battery upon the person of Clyde Scofield and Robert Hobby;

29

18.    As a direct and proximate consequence of the battery, Clyde Scofield and Robert Hobby were caused to suffer physical injuries, medical bills, emotional distress and mental anguish;

WHEREFORE, Plaintiffs, Clyde Scofield and Robert Hobby demand judgment against Defendants, Neil Pittman and the Town of Florala in an amount to be determined by the jury to include, but not be limited to, compensatory and punitive damages, attorneys fees and costs.

(Compl. at 3-4, ¶¶ 16-18.)

Officer Pittman and the City of Florala invoke the State-agent immunity defense against the common-law battery claim in Count Two. (See Ans. at 5, 6th and 8th Defenses.) The City of Florala also invokes the municipal immunity defense against the battery claim in Count Two. (See Ans. at 5, 7th and 9th Defenses.)

As to the punitive damages claim in Count Two, The City of Florala invokes its immunity against punitive damages under state law. (See Ans. at 6, 11th Defense.)

### 1. Failure to State a Claim

#### a. Officer Pittman

As a threshold matter, Count Two does not state a viable claim for battery. There is no allegation that Officer Pittman acted willfully, maliciously, fraudulently, in bad faith, beyond his authority, or under a mistaken interpretation of law, as required to overcome the State-agent immunity defense.

Section 6-5-338 "extends discretionary function immunity to municipal police officers … unless the officer's conduct is so egregious as to amount to

willful or malicious conduct engaged in in bad faith." <u>Couch v. City of Sheffield</u>,
708 So.2d 144, 153 (Ala. 1998).

Code of Alabama section 6-5-338 is the statute that confers State-agent
immunity municipal police officers and their employers:

> (a) Every peace officer … shall at all times be deemed to be officers of
> this state, and as such shall have immunity from tort liability arising
> out of his or her conduct in performance of any discretionary
> function within the line and scope of his or her law enforcement
> duties.
>
> (b) This section is intended to extend immunity only to peace officers
> and governmental units or agencies authorized to appoint peace
> officers.

Ala. Code § 6-5-338 (1975).

"The statute shields every defendant who (1) is a peace officer, (2) is
performing law enforcement duties, and (3) is exercising judgment and
discretion." <u>Howard v. City of Atmore</u>, 887 So.2d 201, 204 (Ala. 2003).

"The restatement of State-agent immunity as set out in <u>Cranman</u>, 792 So.
2d at 405, now governs the determination of whether a peace officer is entitled to
immunity under § 6-5-338(a)." <u>Ex parte City of Tuskegee</u>, 932 So. 2d 895, 904
(Ala. 2005).  The <u>Cranman</u> standard was modified slightly in <u>Hollis v. City of
Brighton</u>, 950 So. 2d 300, 309 (Ala. 2006).

> As modified in <u>Hollis</u>, the <u>Cranman</u> standard now holds:
>
> A State agent shall be immune from civil liability in his or her
> personal capacity when the conduct made the basis of the claim
> against the agent is based upon the agent's
>
> > (1) formulating plans, policies, or designs; or

31

(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:

    (a) making administrative adjudications;

    (b) allocating resources;

    (c) negotiating contracts;

    (d) hiring, firing, transferring, assigning, or supervising personnel; or

(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or

***(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons, or serving as peace officers under circumstances entitling such officers to immunity pursuant to § 6-5-338(a), Ala. Code 1975; or***

(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.

Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity

(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or

> (2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

Ex parte Cranman, 792 So. 2d 392, 405 (Ala. 2000) (Category 4 modified by Hollis v. City of Brighton, 950 So. 2d 300, 309 (Ala. 2006)) (emphasis added).

"Under § 6-5-338, a law enforcement officer is entitled to State-agent immunity if the officer was performing a discretionary function." Swan v. City of Hueytown, 920 So. 2d 1075, 1078 (Ala. 2005). "The statute, by its terms, extends state-agent immunity to peace officers performing discretionary functions within the line and scope of their law-enforcement duties." Moore v. Crocker, 852 So. 2d 89, 90 (Ala. 2002).

"Generally, arrests and attempted arrests are classified as discretionary functions." Borders v. City of Huntsville, 875 So.2d 1168, 1178 (Ala. 2003).

Further, an officer's decision about how much force to use during an arrest is a discretionary function. See City of Birmingham v. Sutherland, 834 So. 2d 755, 762 (Ala. 2002) ("he was performing a discretionary function when he chose to make a warrantless arrest and a discretionary function when he chose the manner in which he would effect the arrest"); Thurmond v. City of Huntsville, 904 So. 2d 314, 326 (Ala. Civ. App. 2004) ("we conclude that the … officers were engaged in the exercise of a discretionary function … when they made the judgment call on how much force to use and under what circumstances to use it").

"Under § 6-5-338, the court must first ask whether the officer was engaged in a discretionary function. If so, the burden shifts to the plaintiff to show that

33

the state officer acted in bad faith, with malice or willfulness in order to deny immunity." McClure v. Houston County, 306 F. Supp. 2d 1160, 1168 (M.D. Ala. 2003); see also Thurmond v. City of Huntsville, 904 So. 2d 314, 320 (Ala. Civ. App. 2004).

Section 6-5-338 "extends discretionary function immunity to municipal police officers … unless the officer's conduct is so egregious as to amount to willful or malicious conduct engaged in in bad faith." Couch v. City of Sheffield, 708 So.2d 144, 153 (Ala. 1998).

Count Two does not allege any of the exceptions that could deprive Officer Pittman of State-agent immunity under the Cranman standard. Therefore, Count Two does not state a claim against Officer Pittman upon which relief can be granted. The claim against Officer Pittman in Count Two should be dismissed under the doctrine of State-agent immunity. Officer Pittman therefore moves for summary judgment on Count Two.

### b. The City of Florala

"It is well established that, if a municipal peace officer is immune pursuant to § 6-5-338(a), then, pursuant to § 6-5-338(b), the city by which he is employed is also immune." Howard v. City of Atmore, 887 So. 2d 201, 211 (Ala. 2003).

Because the allegations of Count Two do not overcome Officer Pittman's entitlement to State-agent immunity, the City of Florala is also entitled to State-agent immunity against the battery claim in Count Two. Accordingly, the City of Florala also moves for summary judgment on Count Two.

### 2. No Genuine Issue of Material Fact

There is also a complete failure of proof on the elements required to overcome State-agent immunity. Mr. Scofield testified that he has no reason to believe that Officer Pittman harbored any malice, ill will or animosity toward him or Mr. Hobby. (See C. Scofield dep. at 71:6-11.)

Officer Pittman and the City of Florala have invoked the State-agent immunity defense against the battery claim in Count Two. (See Ans. at 5, 6th and 8th Defenses.)

Because Officer Pittman was performing a discretionary function when he decided the amount of force to use to effect the arrests of Mr. Hobby and Mr. Scofield, the plaintiffs have the burden to present substantial evidence of malice, ill will or some other exception to the State-agent immunity doctrine. See City of Birmingham v. Sutherland, 834 So. 2d 755, 762 (Ala. 2002) ("he was performing a discretionary function when he chose to make a warrantless arrest and a discretionary function when he chose the manner in which he would effect the arrest"); Thurmond v. City of Huntsville, 904 So. 2d 314, 326 (Ala. Civ. App. 2004) ("we conclude that the … officers were engaged in the exercise of a discretionary function … when they made the judgment call on how much force to use and under what circumstances to use it").

"We have established a burden-shifting process when a party raises the defense of State-agent immunity." Howard v. City of Atmore, 887 So. 2d 201, 205 (Ala. 2003). Upon a showing that the defendant officers were engaged in a discretionary function, "the burden shift[s] to the plaintiff to establish that the defendants acted fraudulently, in bad faith, or with malice or willfulness, in order

to deny the defendants the immunity from suit otherwise provided them by § 6-5-338." <u>Moore v. Adams</u>, 754 So. 2d 630, 632 (Ala. 1999). The plaintiff must produce substantial evidence to satisfy his burden. <u>See</u> <u>Moore v. Adams</u>, 754 So. 2d 630, 634 (Ala. 1999).

Because there is no evidence of any of the elements that could defeat Officer Pittman's State-agent immunity, Officer Pittman is entitled to summary judgment on the basis of State-agent immunity as to the battery claim in Count Two. <u>See</u> Ala. Code § 6-5-338(a) (1975). Officer Pittman moves for summary judgment on that basis.

Also, "It is firmly rooted law that when a municipal officer is immune to liability pursuant to § 6-5-338(a), the municipality is also immune pursuant to § 6-5-338(b), which extends immunity to governmental units or agencies authorized to appoint peace officers." <u>Sherrill v. City of Prattville</u>, Nos. 04-cv-760-T, 04-cv-761-T & 04-cv-762-T, 2005 WL 3277979, at *5 (M.D. Ala. Dec. 2, 2005) (Thompson, J.).

Accordingly, the City of Florala is also entitled to summary judgment on the basis of State-agent immunity for the battery claim in Count Two. The City also moves for summary judgment on that basis.

### 3. *Municipal Immunity from Liability*

If the plaintiffs could establish one of the exceptions to State-agent immunity, the City of Florala would still be entitled to municipal immunity because malicious and willful misconduct falls outside the scope of a

36

municipality's liability for the acts of its employees.  See Ala. Code § 11-47-190 (1975).

As a general rule, a municipality has statutory immunity from all tort claims, except those alleging harm suffered through the neglect, carelessness, or unskillfulness of a municipal employee:

> No city or town shall be liable for damages for injury done to or wrong suffered by any person or corporation, unless such injury or wrong was done or suffered through the *neglect, carelessness or unskillfulness* of some agent, officer or employee of the municipality engaged in work therefor and *while acting in the line of his or her duty...* .

Ala. Code § 11-47-190 (1975) (emphasis added).

"Section 11-47-190 provides a municipality immunity from liability for the acts of its agents that are carried out in bad faith or with malice."  Ex parte City of Tuskegee, 932 So. 2d 895, 910 (Ala. 2005).

Likewise, "under § 11-47-190, a municipality is immune from liability for the intentional torts of its agents."  Ex parte City of Tuskegee, 932 So. 2d 895, 911 (Ala. 2005); see also Romero v. City of Clanton, 220 F. Supp. 2d 1313, 1319 (M.D. Ala. 2002) (Albritton, J.) ("Intentional tort claims cannot be brought against municipalities.").

The Alabama Supreme Court's opinion in Ex parte City of Tuskegee, 932 So. 2d 895, 910 (Ala. 2005), provides the best analysis of the *Catch-22* effect of sections 6-5-338 and 11-47-190 when the municipal employee involved is a police officer.  If the police officer was merely negligent, section 6-5-338(b) bars the claim against the municipality.  If the police officer's conduct surpasses

simple negligence, section 11-47-190 bars the claim against the municipality. Under the combined effect of sections 6-5-338 and 11-47-190, it is virtually impossible to maintain a state law tort claim against a municipality for the conduct of a police officer.

Either way, the City of Florala is entitled to immunity against the battery claim in Count Two under sections 6-5-338(b) and 11-47-190 of the Alabama Code. The City therefore moves for summary judgment on Count Two.

### 4. Municipal Immunity from Punitive Damages Claim

The City of Florala also invokes municipal immunity from the plaintiffs' punitive damages claim in Count Two. (See Ans. at 6, 11th Defense.) Code of Alabama section 6-11-26 (1975) states, "Punitive damages may not be awarded against the State of Alabama or any county or municipality thereof, or any agency thereof, except any entity covered under the Medical Liability Act now codified as Section 6-5-480 et seq., or any acts amendatory thereto."

Under section 6-11-26, the City of Florala is entitled to immunity against the punitive damages claim in Count Two and, therefore, moves for summary judgment on that claim.

### D. Count Three: The State Law False Imprisonment Claim

Count Three purportedly states a claim against the City of Florala for the false imprisonment of Mrs. Scofield and Ms. Copley:

> 19.   Plaintiffs, Tina Scofield and Penny Copley incorporate by reference the factual averments of paragraphs six through eleven;

> 20.   Plaintiffs, Tina Scofield and Penny Copley, were unlawfully detained by police officers of the Town of Florala, acting within the line and scope of their employment;

38

WHEREFORE, Plaintiffs, Tina Scofield and Penny Copley, demand judgment against the Defendant, Town of Florala, for an amount to be determined by the jury to include, but not be limited to, compensatory and punitive damages, costs and attorneys fees.

(Compl. at 4, ¶¶ 19-20.)

The City of Florala invokes the State-agent immunity defense against the state law false imprisonment claim in Count Three. (See Ans. at 5, 6th and 8th Defenses.) The City of Florala also invokes the municipal immunity defense against the false imprisonment claim in Count Three. (See Ans. at 5, 7th and 9th Defenses.)

As to the punitive damages claim in Count Three, The City of Florala invokes its immunity against punitive damages under state law. (See Ans. at 6, 11th Defense.)

### 1. Duty to Render Aid

Under Alabama law, Mrs. Scofield and Ms. Copley were legally obligated to aid Officers Snow and Abraham, because it is undisputed that they were trying to effect the arrest of a fleeing felon. (See Compl. at 6, ¶ 29.) This legal obligation is codified in Alabama's Criminal Code:

(a) A person commits the crime of refusing to aid a peace officer if, upon command by a peace officer identified to him as such, he fails or refuses to aid such peace officer in:

(1) Effecting or securing a lawful arrest; or

(2) Preventing the commission by another person of any offense.

(b) A person is not liable under this section if the failure or refusal to aid the officer was reasonable under the circumstances. The burden of injecting this issue is on the defendant, but this does not shift the burden of proof.

39

(c) Refusing to aid a peace officer is a Class C misdemeanor.

Ala. Code § 13A-10-5 (1975).

The officers did not physically restrain Mrs. Scofield and Ms. Copley, or specifically order them to remain in the vehicle. (<u>See</u> Copley dep. at 47:2 to 48:18.) The officers did not keep the plaintiffs' vehicle. (<u>See</u> Copley dep. at 50:4-6, 50:23 to 51:2.)

Officer Snow merely directed the plaintiffs to transport him and Officer Abraham to the police where the car chase had ended. (<u>See</u> Copley dep. at 51:3-8.) After they arrived, officer Snow sent the plaintiffs back to pick up Mr. Scofield and Mr. Hobby. (<u>See</u> Copley dep. at 55:3-5.)

Code of Alabama section 6-5-170 (1975) states, "False imprisonment consists in the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty." In light of section 13A-10-5, quoted above, Mrs. Scofield and Ms. Copley were not deprived of their personal liberty *unlawfully*.

In fact, they never even protested Officer Snow's request. (<u>See</u> Copley dep. at 48:22 to 49:20.)

Accordingly, there was no false imprisonment, and the City moves for summary judgment on the merits.

### 2.  *State-agent Immunity*

In any event, there is no evidence that Officers Snow and Abraham acted willfully, maliciously, fraudulently, in bad faith, beyond their authority, or under

a mistaken interpretation of law, as required to overcome their entitlement to State-agent immunity.

Section 6-5-338 "extends discretionary function immunity to municipal police officers … unless the officer's conduct is so egregious as to amount to willful or malicious conduct engaged in in bad faith." Couch v. City of Sheffield, 708 So.2d 144, 153 (Ala. 1998).

Because Officers Snow and Abraham would have been entitled to State-agent immunity if they had been sued, the City of Florala is likewise entitled to State-agent immunity against the false imprisonment claim in Count Three. See Howard v. City of Atmore, 887 So. 2d 201, 211 (Ala. 2003) ("It is well established that, if a municipal peace officer is immune pursuant to § 6-5-338(a), then, pursuant to § 6-5-338(b), the city by which he is employed is also immune."). The City moves for summary judgment on Count Three.

### 3. Municipal Immunity from Liability

As explained in Section IV(C)(3), supra, if the plaintiffs could establish one of the exceptions to State-agent immunity, the City of Florala would still be entitled to municipal immunity because malicious and willful misconduct fall outside the scope of a municipality's liability for the acts of its employees. See Ala. Code § 11-47-190 (1975).

Either way, the City of Florala is entitled to immunity against the false imprisonment claim in Count Three under sections 6-5-338(b) and 11-47-190 of the Alabama Code. The City therefore moves for summary judgment on Count Three.

### 4. Municipal Immunity from Punitive Damages

As explained in Section IV(C)(4), supra, the City of Florala has immunity from punitive damages under Code of Alabama section 6-11-26 (1975). Accordingly, the City moves for summary judgment on the punitive damages claim in Count Three.

## E. Count Four: Negligent, Wanton or Willful Hiring , Training, Supervision and Retention

Count Four purportedly states a claim by Mr. Scofield and Mr. Hobby against the City of Florala for negligently, wantonly or willfully hiring, training, supervising and retaining Officer Pittman:

> 21. Plaintiffs, Clyde Scofield and Robert Hobby incorporate by reference the factual averments of paragraphs six through eleven;

> 22. Defendant, the City of Florala owed a duty to hire, train and supervise its police officer, Neil Pittman;

> 23. The City of Florala knew, or had reason to know, that police officer Neil Pittman used and had used inappropriate and excessive force in effectuating arrests;

> 24. The City of Florala negligently, willfully and/or wantonly breached its duty by its continued employment of police officer Neil Pittman, and/or its failure to instruct and train the police officer on the appropriate use of force, and/or hired police officer Neil Pittman with knowledge of his inappropriate use of force;

> 25. As a proximate result of the foregoing breach of its (City of Florala) duty, the Plaintiffs, Clyde Scofield and Robert Hobby, were caused to suffer physical injury, mental anguish and sufferings, and monetary expenses for medical treatment;

> WHEREFORE, the Plaintiffs, Clyde Scofield and Robert Hobby demand judgment against the Defendant, the City of Florala for an amount to be determined by the jury for compensatory and punitive damages and costs; and for such further relief as the Plaintiffs may be entitled.

(Compl. at 4-5, ¶¶ 21-25.)

As to the Claims in Count Four, the City of Florala invokes the municipal immunity defense against direct claims for negligence of this type, and against all claims for wantonness and willfulness. (See Ans. at 5, 7th and 9th Defenses.) The City of Florala also invokes the State-agent immunity defense against the claims in Count Four. (See Ans. at 5, 6th and 8th Defenses.)

As to the punitive damages claim in Count Four, The City of Florala invokes its immunity against punitive damages under state law. (See Ans. at 6, 11th Defense.)

### 1. *Negligence-based Claims*

Under Alabama law, municipalities cannot be liable for negligent hiring, training, supervision or retention.

In City of Crossville v. Haynes, the Alabama Supreme Court held the Plaintiff could not bring a direct claim against the city for negligence. 925 So. 2d 944, 956 (Ala. 2005) ("Haynes was not entitled to assert a 'direct' claim against the City of Crossville under § 11-47-190."). The Supreme Court held the city was entitled to a judgment as a matter of law and reversed a jury award for the plaintiff. See id.

In Styron v. City of Foley, Judge Granade of the United States District Court for the Southern District of Alabama held, "Alabama does not recognize an action against a municipality for negligent hiring, supervising, or training." No. 03-572-CG-L, 2005 WL 3098926, at *4-5 (S.D. Ala. Nov. 18, 2005) (Granade, C.J.).

Judge Butler reached the same holding in <u>Ott v. City of Mobile</u>, 169 F. Supp.2d 1301, 1314-15 (S.D. Ala. 2001) (Butler, C.J.) (holding direct action will not lie against municipality for negligent training of police officer).

The barrier against this type of claim is Section 11-47-190:

> No city or town shall be liable for damages for injury done to or wrong suffered by any person or corporation, ***unless such injury or wrong was done or suffered through the neglect, carelessness or unskillfulness of some agent, officer or employee of the municipality engaged in work therefor and while acting in the line of his or her duty, or unless the said injury or wrong was done or suffered through the neglect or carelessness or failure to remedy some defect in the streets, alleys, public ways or buildings after the same had been called to the attention of the council or other governing body or after the same had existed for such an unreasonable length of time as to raise a presumption of knowledge of such defect on the part of the council or other governing body*** and whenever the city or town shall be made liable for damages by reason of the unauthorized or wrongful acts or negligence, carelessness or unskillfulness of any person or corporation, then such person or corporation shall be liable to an action on the same account by the party so injured. However, no recovery may be had under any judgment or combination of judgments, whether direct or by way of indemnity under Section 11-47-24, or otherwise, arising out of a single occurrence, against a municipality, and/or any officer or officers, or employee or employees, or agents thereof, in excess of a total $100,000 per injured person up to a maximum of $300,000 per single occurrence, the limits set out in the provisions of Section 11-93-2 notwithstanding.

Ala. Code § 11-47-190 (1975) (emphasis added).

Section 11-47-190 limits municipality liability for personal injuries to two circumstances: (1) *respondeat superior* liability based on the neglect, carelessness or unskilfulness of a municipal employee and (2) defective conditions in the

streets, alleys, public ways, or buildings.  Category (2) is the only form of direct action for personal injury allowed against a municipality.

In <u>City of Lanett v. Tomlinson</u>, the Alabama Supreme Court explained:

> This Court has long interpreted § 11-47-190 to limit municipal liability to two distinct classes.  The municipality may be liable (1) under the doctrine of respondeat superior for injuries that result from the wrongful conduct of its agents or officers in the line of duty. The municipality may also be liable (2) for injuries that result from its failure to remedy conditions created or allowed to exist on the streets, alleys, or public ways by a person or corporation "not related in service" to the municipality.

<u>City of Lanett v. Tomlinson</u>, 659 So. 2d 68, 70 (Ala. 1995).

In this case, there is no allegation of a defect in the City's streets, alleys, public ways, or buildings.  Therefore, a direct action will not lie.

That leaves only the *respondeat superior* circumstance.  The question becomes whether the Mr. Scofield and Mr. Hobby could maintain a claim against one of the City's other employees – such as the police chief – for negligently hiring, training or supervising Officer Pittman.  If the police chief could be liable under such circumstances, then Mr. Scofield and Mr. Hobby could attempt to hold the City responsible for the Chief's negligence under § 11-47-190.

The problem, however, is that Alabama law does not impose a duty upon supervisory employees with regard to the hiring, training or supervision of their subordinates.  The duty lies exclusively with the employer.  In <u>Ott v. City of Mobile</u>, Chief United States District Judge Butler of the Southern District explained this concept:

Alabama law is clear that the tort of negligent supervision or training requires as an element the existence of a master-servant relationship. "We are mindful of ... the fact that this Court recognizes a cause of action against the master based upon the incompetence of the servant." Lane v. Central Bank, N.A., 425 So.2d 1098, 1100 (Ala.1983)(emphasis added); accord Big B, Inc. v. Cottingham, 634 So.2d 999, 1002-03 (Ala.1993). A supervisor is not the master of a subordinate, nor is the subordinate the servant of the supervisor; rather, as Alabama cases make plain, the status of "master" is restricted to one who is actually or essentially the employer of the servant. E.g., Tyson Foods, Inc. v. Stevens, 783 So.2d 804, 807-08 (Ala.2000) (a contractor becomes the master of a subcontractor by retaining sufficient right to control the manner in which the subcontractor works); Hauseman v. University of Alabama Health Services Foundation, 793 So.2d 730, 735-36 (Ala.2000) (using "master" interchangeably with "employer"). Indeed, the plaintiffs recognize as much, admitting that their theory does not depend on negligence of the "employer or master" but of a supervisor. (Doc. 68 at 27). Accordingly, because Alabama recognizes no cause of action against a supervisor for negligent failure to supervise or train a subordinate, Count Four is due to be dismissed.

169 F. Supp. 2d 1301, 1315 (S.D. Ala. 2001).

Assuming *arguendo* that a police chief could be liable for the hiring, training, or supervision of a subordinate, however, the chief would have immunity for negligence. See City of Crossville v. Haynes, 925 So. 2d 944, 956 (Ala. 2005) (holding police chief entitled to State-agent immunity against negligent training claim); Howard v. City of Atmore, 887 So. 2d 201, 209-10 (Ala. 2003) (holding police chief entitled to State-agent immunity against negligent training claim).

Accordingly, the City is likewise immune under Alabama Code § 6-5-338(b). See Howard v. City of Atmore, 887 So. 2d 201, 211 (Ala. 2003) ("It is well

established that, if a municipal peace officer is immune pursuant to § 6-5-338(a), then, pursuant to § 6-5-338(b), the city by which he is employed is also immune." ).

There is no viable basis upon which to hold the City liable for alleged negligence in the hiring, training, supervision or retention of Officer Pittman. The City has immunity from such claims under sections 11-47-190 and 6-5-338(b). Therefore, the City moves for summary judgment on the negligence claims in Count Four.

### 2.  *Wantonness and Willfulness Claims*

Section 11-47-190 also bars the wantonness and willfulness claims against the City of Florala.

"Intentional tort claims cannot be brought against municipalities." Romero v. City of Clanton, 220 F. Supp. 2d 1313, 1319 (M.D. Ala. 2002) (Albritton, J.).

Likewise, "Because proof of wantonness requires evidence of a reckless or conscious disregard of the rights and safety of others, section 11-47-190 insulates the Town of Hayneville from liability for wantonness." Hardy v. Town of Hayneville, No. 99-A-86-N, 1999 U.S. Dist. LEXIS 4219, at *30 (M.D. Ala. Apr. 1, 1999), modified on reh'g, 50 F. Supp.2d 1176, 1195 (M.D. Ala. 1999) (Albritton, J.).

Based on the prior holdings of this Court, the City of Florala also has immunity from the willfulness and wantonness claims in Count Four. The City therefore moves for summary judgment on the willfulness and wantonness claims in Count Four.

### 3.  No Evidence

Even if the Mr. Scofield and Mr. Hobby could maintain claims against the City for negligent, wanton or willful hiring, training, supervision and retention, the City would still be entitled to summary judgment on those claims.  The plaintiffs have not conducted any discovery on these issues, and there is no evidence to support these claims.

The City is not required to disprove Mr. Scofield's and Mr. Hobby's allegations.  The City is permitted to point out the absence of proof on these issues, and the burden shifts to Mr. Scofield and Mr. Hobby to present substantial evidence to support their claims.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) and Section IV(F)(2), infra.

Because the Mr. Scofield and Mr. Hobby do not have any evidence to support their claim, the City moves for summary judgment on Count Four.

### 4.  Municipal Immunity from Punitive Damages

As explained in Section IV(C)(4), supra, the City of Florala has immunity from punitive damages under Code of Alabama section 6-11-26 (1975). Accordingly, the City moves for summary judgment on the punitive damages claim in Count Four.

## F.  Count Five: First, Fourth, Eighth and Fourteenth Amendment Claims

Count Five purportedly states a claim against the City of Florala for violating Mr. Hobby's rights under the First, Fourth, Eighth and Fourteenth Amendments:

> 26.    Plaintiff, Robert Hobby, incorporates the factual averments of paragraphs six through eleven;

48

27.    On or about June 25, 2005, the Defendant, Neil Pittman, acting in his capacity as a police officer for the Defendant municipality, the City of Florala, Alabama, unlawfully and maliciously deprived and/or conspired to deprive the Plaintiff, Robert Hobby of certain rights guaranteed to him by the Constitution and Laws of the United States;

28.    Plaintiff, Robert Hobby, is entitled to the fair and equal application of the Alabama Criminal statutes and the protection afforded him by the laws enacted by the United States Congress and the legislature of the State of Alabama.  The actions of the Defendant police officer, Neil Pittman, on June 25, 2005, directly and proximately resulted in a deprivation of Robert Hobby's basic civil rights as guaranteed by the First, Fourth, Eighth and Fourteenth Amendments to the United States Constitution and similar provisions of the State of Alabama Constitution.  It is believed and averred that the defendant, the City of Florala, maintains an official policy to perform arrests of individuals who voice opposition and challenge police action or authority;

29.    ***More specifically, the Plaintiff, Robert Hobby avers that his vehicle was seized by police officers of the City of Florala; that the City of Florala did not have in place a policy or procedure for the "commandeering" of vehicles;*** the police officers demanded that Hobby's daughters remain in the vehicle as they (the police) pursued a fleeing felon; that the police officers left Plaintiff, Robert Hobby, an elderly man with significant health problems on the side of the road in the mid-day sun; and that when the Plaintiff, Robert Hobby, verbally challenged the police officer, he was arrested solely for the words he used, *i.e.* protected speech. There did not exist probable cause for an arrest for disorderly conduct.  Moreover, said arrest was attended with excessive force;

30.    The actions, conduct, practice policy and/or custom of the Defendant, the City of Florala, its police department and officers resulted in physical and emotional injury, false arrest and battery to the person of the Plaintiff, Robert Hobby.

WHEREFORE, the ***Plaintiff Robert Hobby demands judgment against the City of Florala*** for compensatory and punitive damages, attorney's fees and costs in an amount to be determined by the jury.

(Compl. at 5-6, ¶¶ 26-30 (emphasis added).)

49

As to Count Five, the City of Florala invokes its immunity against punitive damages under federal law. (See Ans. at 6, ¶ 11th Defense.)

Count Five alleges the City violated Mr. Hobby's rights under the First, Fourth, Eighth and Fourteenth Amendments because his vehicle was seized in the absence of any policy or procedure for commandeering vehicles. Accordingly, he demands a judgment against the City for compensatory and punitive damages.

At the outset, it is important to recognize that, "The Supreme Court has placed strict limitations on municipal liability under § 1983." Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998). "A municipality may not be held liable under § 1983 solely because it employs a tortfeasor." Board of the County Commr.'s v. Brown, 520 U.S. 397, 403 (1997).

"To impose section 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004).

In this case, the municipal liability claim in Count Five fails on all accounts.

### 1. *No Underlying Constitutional Violation*

First, there is no allegation or evidence of an underlying constitutional violation. Municipal liability cannot attach absent an underlying constitutional violation. See City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986). "Although

50

[§ 1983] provides the citizen with an effective remedy against those abuses of state power that violate federal law, it does not provide a remedy for abuses that do not violate federal law." Collins v. City of Harker Heights, 503 U.S. 115, 119 (1992).

Count Five does not identify which of Mr. Hobby's First, Fourth, Eighth and Fourteenth Amendment rights were allegedly violated. The City and the Court should not be left to guess.

As Judge DeMent has written, "a lawsuit is not a game of hunt the peanut." Dinkins v. Charoen Pokphand USA, Inc., 133 F. Supp 2d 1254, 1261 (M.D. Ala. 2001).

"Federal Rule of Civil Procedure 8(a) requires that a complaint contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" Brown v. Snow, 440 F.3d 1259, 1266 (11th Cir. 2006). The pleading must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Conley v. Gibson, 355 U.S. 41, 47 (1957).

"At a minimum, notice pleading requires that a complaint contain inferential allegations from which we can identify each of the material elements necessary to sustain a recovery under some viable legal theory." Roe v. Aware Woman Ctr. for Choice, Inc., 253 F.3d 678, 684 (11th Cir. 2001).

Count Five alleges the City violated four constitutional amendments, but does not identify the violation of any specific constitutional right within those amendments. Count Five does not even mention any specific constitutional right.

Because Mr. Hobby did not plead an underlying violation of a specific constitutional right, Count Five does not state a claim for municipal liability.  See City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (holding municipal liability cannot attach without underlying constitutional violation).  Accordingly, the City moves for summary judgment on Count Five.

### 2. *No Municipal Custom or Policy*

In any event, the plaintiffs have not conducted any discovery on the issue of municipal policies and customs.  There is a complete failure of proof on this element of the claim.

"Summary judgment is proper when the movant shows an absence of evidence to support an essential element of the nonmovant's case."  McCaleb v. A.O. Smith Corp., 200 F.3d 747, 752 (11th Cir. 2000).

"A moving party discharges its burden on a motion for summary judgment by 'showing' or 'pointing out' to the Court that there is an absence of evidence to support the non-moving party's case."  Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593 (11th Cir. 1995).

As the Supreme Court has explained, the movant is not required to present affidavits to prove the absence of an essential element of the non-movant's claim:

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.  But unlike the Court of Appeals, we find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.  On the contrary, Rule 56(c), which refers to "the affidavits, if any" (emphasis added), suggests the

absence of such a requirement.  And if there were any doubt about the meaning of Rule 56(c) in this regard, such doubt is clearly removed by Rules 56(a) and (b), which provide that claimants and defendants, respectively, may move for summary judgment " with or without supporting affidavits" (emphasis added).  The import of these subsections is that, regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied.  One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In accordance with the Supreme Court's holding in Celotex, the City points out that there is a complete absence of proof of any unconstitutional policy or custom.

"To establish a policy or custom, it is generally necessary to show a persistent and wide-spread practice."  Depew v. City of St. Marys, 787 F.2d 1496, 1499 (11th Cir. 1986).  "Normally random acts or isolated incidents are insufficient to establish a custom or policy."  Depew v. City of St. Marys, 787 F.2d 1496, 1499 (11th Cir. 1986).

Because there is no evidence of any unconstitutional policy or custom, the City moves for summary judgment on Count Five.

### 3.  *Municipal Immunity Against Punitive Damages*

The City of Florala also invokes its immunity against punitive damages under federal law.  See City of Newport v. Fact Concerts, Inc., 453. U.S. 247, 271 (1981).  The City moves for summary judgment on the punitive damages claim in Count Five.

53

**G. Count Six: First, Fourth, Eighth and Fourteenth Amendment Claims**

Count Six purportedly states a claim against the City for violating Mr. Scofield's and Mr. Hobby's unspecified First, Fourth, Eighth and Fourteenth Amendment rights:

31.    Plaintiffs, Robert Hobby and Clyde Scofield, incorporate the factual averments of paragraphs six through eleven;

32.    On or about June 25, 2005, the Defendant, Neil Pittman, acting in his capacity as a police officer for the Defendant municipality, the City of Florala, Alabama, unlawfully and maliciously deprived and/or conspired to deprive the Plaintiffs, Robert Hobby and Clyde Scofield or certain rights guaranteed to him by the Constitution and Laws of the United States;

33.    Plaintiffs, Robert Hobby and Clyde Scofield, are entitled to the fair and equal application of the Alabama Criminal statutes and the protection afforded them by the laws enacted by the United States Congress and the legislature of the State of Alabama.  The actions of the Defendant police officer, Neil Pittman, on June 25, 2005, directly and proximately resulted in a deprivation of Robert Hobby's and Clyde Scofield's basic civil rights as guaranteed by the First, Fourth, Eighth and Fourteenth Amendments to the United States Constitution and similar provisions of the State of Alabama Constitution*.  It is believed and averred that the Defendant, the City of Florala, maintains an official policy to perform arrests of individuals who voice opposition and challenge police action or authority; and further to effectuate the arrest with an amount of force excessive and intended to punish those who may question police authority;*

33.    More specifically, the Plaintiffs, Robert Hobby and Clyde Scofield, aver that when Robert Hobby demanded the return of his vehicle and expressed concerns for the safety of his daughters, police officer Neil Pittman became enraged and agitated and effectuated an unlawful arrest of Robert Hobby.  In the course of the unlawful arrest of Hobby, Clyde Scofield went to the aid of his father-in-law and was himself unlawfully arrested and became the victim of unreasonable and excessive force.  Both Plaintiffs required medical treatment for their physical injuries.

29.    The actions, conduct, practice policy and/or custom of the Defendant, the City of Florala, its police department and officers

resulted in physical and emotional injury, false arrest and battery to the persons of the Plaintiffs, Robert Hobby and Clyde Scofield.

WHEREFORE, the **Plaintiffs, Robert Hobby and Clyde Scofield demand judgment against the City of Florala** for compensatory and punitive damages, attorney's fees and costs in an amount to be determined by the jury.

(Compl. at 6-7, ¶¶ 31-33, 29 (emphasis added).)

As to Count Six, the City of Florala invokes its immunity against punitive damages under federal law.  (See Ans. at 6, ¶ 11th Defense.)

### 1. No Underlying Constitutional Violation

Count Six fails for the same reasons identified in Section IV(F)(1), supra. Count Six simply does not identify a single specific constitutional right that the City allegedly violated.  See City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986).  Because there is no allegation of a specific constitutional violation, the City moves for summary judgment on Count Six.

### 2. No Municipal Custom or Policy

Count Six also fails because there is a complete absence of proof of any unconstitutional municipal custom or policy.

"We have required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." Board of the County Commr.'s v. Brown, 520 U.S. 397, 403 (1997).

That is the second element of a § 1983 municipal liability claim.  See McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004).

The plaintiffs have not conducted any discovery, or otherwise uncovered any evidence of an unconstitutional municipal policy or custom.

Under the Supreme Court's holding in <u>Celotex</u>, the City informs the Court of the complete absence of proof on this issue.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Based upon that absence of proof, the City moves for summary judgment on Count Six.

### 3.  *Municipal Immunity Against Punitive Damages*

As in Section IV(F)(3), <u>supra</u>, the City of Florala invokes its immunity against punitive damages under federal law.  <u>See</u> <u>City of Newport v. Fact Concerts, Inc.</u>, 453. U.S. 247, 271 (1981).  The City moves for summary judgment on the punitive damages claim in Count Six.

### V.  <u>CONCLUSION</u>

For the foregoing reasons, the City of Florala and Officer Neil Pittman move for summary judgment on all claims.


**s/ James H. Pike**
James H. Pike  (PIK003)
Attorney for Defendants
The City of Florala, Alabama, and Neil Pittman


OF COUNSEL:

SHEALY, CRUM & PIKE, P.C.
P.O. Box 6346
Dothan, Alabama  36302-6346
Tel. (334) 677-3000
Fax (334) 677-0030
E-mail: jpike@scplaw.us

**<u>CERTIFICATE OF SERVICE</u>**

I, James H. Pike, certify that on September 3, 2008, I electronically served

this document upon:

Mr. Charles M. Brunson, Sr.
Jared & Brunson
P.O. Box 358
Elba, AL  36323-0358

Mr. Steven E. Blair
P.O. Box 310843
Enterprise, AL  36331-0843

**s/ James H. Pike**
James H. Pike

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE MIDDLE DISTRICT OF ALABAMA

3                    NORTHERN DIVISION

4

5

6    CASE NO.:  2:07-cv-579-MEF

7

8    CLYDE SCOFIELD, et al.,

9              Plaintiff(s),

10   vs.

11   CITY OF FLORALA, ALABAMA,

12   et al.,

13             Defendant(s).

14

15

16                    DEPOSITION OF

17                    CLYDE SCOFIELD

18                         JOB NO. 1101-57590

19

20   BEFORE:     Victoria M. Castillo

21               Certified Court Reporter and

22               Notary Public

23               ACCR# 17, Expires 9/30/2008

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 56

1    didn't care, and that me and Mr. Hobby had to go.

2    And so they put us out there in that 100-degree hot

3    weather, and you know how -- or I don't know where

4    you're from, but around here in July in the middle

5    of the day it's pretty hot.  And they put us out

6    about a quarter of a mile from where we -- that

7    officer had stuck his car.  Well, I was -- finally

8    got him down the bank, and I was walking him up to

9    the police car to see if he would let him sit in

10   the car with the air conditioner running, and we

11   got about halfway up there, and the officer opened

12   the trunk and slammed it on the back of the glass

13   of the car.  Well, there's another guy standing

14   there.  And I told Mr. Hobby to let's go on to the

15   shade because that fellow looked like he was mad to

16   start with.  Well, I didn't say nothing to him, and

17   then I thought to turned around in the middle of

18   the road, and I said -- you know that the Florida

19   line is right down there.  And he told me he didn't

20   care where the "F"ing Florida line was, that it

21   didn't matter, that that "SOB" was going to be

22   caught whether the Florida line was right down

23   there or not.  So then he said it didn't make no

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 65

1      Q.      All right.

2      A.      My wife was driving; my sister-in-law

3  was sitting up in the front with her.  Me and

4  Mr. Hobby was in the back.

5      Q.      What side of the back were you on?

6      A.      The left.

7      Q.      Behind your wife?

8      A.      Yes, sir.

9      Q.      Who drove the vehicle over to your

10 house?

11     A.      My sister-in-law --

12     Q.      Where is --

13     A.      -- Ms. Copley.

14     Q.      How far from your house was -- did

15 Mr. Hobby live at that time?

16     A.      I don't really know.  He lived in

17 Florala.  We lived out on (inaudible) Highway.  I

18 don't know.

19     Q.      It wasn't walking distance though?

20     A.      No, sir.

21     Q.      In other words, you don't live next

22 door and everybody walked out and got in the car

23 that was parked between --

Page 71

1    that Officer Neil Pittman held any grudge or Ill

2    will or malice toward you or your father?

3         A.    My father's dead, but no, sir.

4         Q.    I'm sorry, your father-in-law?

5         A.    No, sir, not that I know of.

6         Q.    Let me re-ask that just because I got

7    it wrong.  Do you have any reason to believe that

8    Officer Neil Pittman harbored any malice or ill

9    will or animosity toward you or your father-in-law,

10   Robert Hobby?

11        A.    No, sir.

12        Q.    You said there was a third officer

13   that was present at some time that day?

14        A.    No, sir, there was another witness.

15        Q.    Okay.  There wasn't another officer

16   at any point?

17        A.    Yes, sir, they all come swarming up

18   whenever they -- he throwed me in the back of that

19   hot car.  There was about -- I don't know how many

20   carloads of them, but they all showed up at one

21   time.

22        Q.    Just -- just so we can make sure that

23   we're clear about one thing.  As between you and

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 72

1    Officer Neil Pittman, the first physical contact

2    was you touching him, right?

3         A.     Yes, sir, I got him off of Mr. Hobby

4    because he was choking him to death.

5         Q.     But to be clear, you touched Officer

6    Pittman before he touched you?

7         A.     Yes, sir.

8         Q.     Now you said you -- you and your

9    family had left your home, they had picked you up,

10   and your wife, Tina, up, and you-all were going to

11   eat.  What road were you taking when you first came

12   into contact with the police?

13        A.     County Road 4.

14        Q.     Were you aware that there had been a

15   police chase going on?

16        A.     No, sir, not at that time.

17        Q.     Well, you told me earlier about

18   something about a bicycle with no wheels?

19        A.     Yes, sir, I found that out

20   afterwards.

21        Q.     Okay.  Who -- who was on the bicycle

22   with no wheels?

23        A.     I don't know.

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 74

1    what happened?

2         A.     I just told you.

3         Q.     Was the first thing that happened

4    that called your attention to the police?

5         A.     They was out there waving their arms

6    for us to stop.

7         Q.     How many of them were doing that?

8         A.     Two of them.

9         Q.     And was that Officer Tim Snow and

10   Officer Mike Abraham?

11        A.     Yes, sir.

12        Q.     Was Officer Neil Pittman down by his

13   car at the time?

14        A.     No, sir, he was trying to get his car

15   unstuck.

16        Q.     So he was down by his car at the

17   time?

18        A.     He was in his car trying to get it

19   unstuck.

20        Q.     All right.  And if -- if I understand

21   correctly -- I've been out there to that piece of

22   road -- what you have is you got County Road 4

23   that's getting ready to go over a bridge there at

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 75

1    the river?

2        A.    Yellow River.

3        Q.    And you have a dirt road that runs

4    down to the river that you might take if you were

5    going to put a boat in or wanted to go fish?

6        A.    Uh-huh.

7        Q.    Is that yes?

8        A.    Yes, sir.

9        Q.    And Officer Neil Pittman's car was

10   down on that dirt road, which is a pretty steep

11   drop-off from the highway?

12       A.    Uh-huh.

13       Q.    Is that yes?

14       A.    Yes, sir.  He was hung up right

15   there, right up there on that thing at Jill Pass or

16   then the road circled around comes right back out

17   where he was sitting right there on the thing.

18       Q.    So if Officer Neil Pittman is down

19   there by his car, he's not really anywhere close to

20   where you-all are up on the highway at the point

21   you're flagged down by --

22       A.    We weren't on the highway.

23       Q.    On County Road 4?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 76

1    A.    No, sir.

2    Q.    Where were you?

3    A.    We walked down.  I told you I got him

4  down to the dirt road.

5    Q.    I'm talking about at the point you

6  were flagged down.

7    A.    Oh, yes, we was on the highway --

8    Q.    Okay.

9    A.    -- yes, sir.

10    Q.    Let me finish my question.  So if

11  Officer Pittman is down by his car, he's not really

12  anywhere near where you-all were up on the highway

13  at the point in time you got flagged down by

14  Officer Snow and Officer Abraham?

15    A.    Right.

16    Q.    He -- he's a pretty good distance

17  away and not involved in getting you-all flagged

18  down?

19    A.    Yes, sir.

20    Q.    Is that correct?

21    A.    That's correct.

22    Q.    So the only two officers involved in

23  flagging you-all down are Officer Snow and Officer

Page 77

1      Abraham?

2          A.      Right.

3          Q.      And you told me earlier that Officer

4      Snow is the one that actually did all the talking?

5          A.      Yes, sir.

6          Q.      Officer Abraham didn't say anything

7      at the point in time you-all were flagged down and

8      got out of the car?

9          A.      No, sir.

10         Q.      Is that correct?

11         A.      No, sir.

12         Q.      That's correct?

13         A.      That's correct.

14         Q.      So what did Officer Snow say?

15         A.      He told me and Mr. Hobby to get out,

16     and my wife and my sister-in-law went to get out,

17     and he told them to stay in the car or truck, or

18     whatever you want to call it, that he needed them

19     to drive him back there on that dirt road.

20         Q.      All right.  And did you and your

21     father-in-law, Robert Hobby, get out of the

22     vehicle?

23         A.      Yes, sir.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 80

1    diabetic comas.

2         Q.    All right.  So Officer Snow and

3    Officer Abraham both got inside the vehicle with

4    your wife and your sister-in-law?

5         A.    Right.

6         Q.    And your sister-in-law was

7    Ms. Copley?

8         A.    Right.

9         Q.    And -- and they drove off?

10        A.    Yes, sir.

11        Q.    And leaving you and Mr. Hobby there

12   on the County Road 4?

13        A.    Right.

14        Q.    So you were not in the vehicle with

15   the police traveling to wherever the car chase had

16   ended?

17        A.    No, sir.

18        Q.    So you don't know what happened

19   during their trip because you weren't there?

20        A.    No, sir, I was not there.

21        Q.    So that's correct that you don't know

22   what happened during their trip?

23        A.    No, sir.

Page 81

1      Q.     That is correct?

2      A.     What?

3      Q.     I'm correct when I say you do not

4    know what happened during their trip?

5      A.     No, sir, I wasn't with them.

6      Q.     So you do not know what happened,

7    correct?

8      A.     Correct.

9      Q.     We got to make sure we're clear,

10   okay?

11     A.     Okay.

12     Q.     All right.  So you and Mr. Hobby

13   stayed back on County Road 4, and Officer Pittman's

14   car is stuck down on a dirt road that's near County

15   Road 4?

16     A.     He got the car unstuck while we was

17   walking up there, because it was a pretty good

18   distance.  We was almost at the bridge there at the

19   highest point of that bank going down to that

20   fishing road you was talking about -- okay.  I had

21   to get Mr. Hobby down that bank.  Then he was about

22   give out, so I told him, I said -- let's walk up

23   here.  As you call him, Mr. Pittman had got his car

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 82

1    unstuck by that time, so I was going to walk up

2    there and ask him if Mr. Hobby could sit in his

3    car -- because I figured he had the air conditioner

4    on -- and cool off.

5         Q.    Okay.  So up until this point,

6    you-all had not had any interaction with Officer

7    Pittman?

8         A.    No, sir.

9         Q.    Officer Pittman had not been involved

10   in flagging your vehicle down, correct?

11        A.    Correct.

12        Q.    And Officer Pittman did not come up

13   to you-all or approach you-all?

14        A.    No, sir.

15        Q.    Officer Pittman did not tell you and

16   your father-in-law to come over there to him?

17        A.    No, sir, I walked right by him.

18        Q.    Okay.  It was you and your

19   father-in-law that went and initiated contact with

20   Officer Pittman?

21        A.    No, no.  I was in the middle of the

22   road now talking to this other guy.  Mr. Hobby had

23   fell behind, and I turned around and said to

**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trial Services

Page 83

1    Mr. Pittman -- just like I told you while ago --

2    that the Florida line was right down there.

3        Q.    Okay.  Hold on.

4        A.    And he's the one that started

5    initiated all the cussing and raising sand.

6        Q.    Okay.  Hold on a second.  What was

7    the name of the other guy you were talking to?

8        A.    I don't know.

9        Q.    Who is that other guy?

10       A.    I don't know.

11       Q.    Do you know how we can get in touch

12   with him?

13       A.    No, sir, I sure don't.

14       Q.    If we wanted to ask him what he saw

15   or heard that day, how would we find him?

16       A.    I don't know.  I don't know him.

17       Q.    How would you find him if you wanted

18   to find him?

19       A.    I don't know.  If I knew, I'd have

20   him up here today.

21       Q.    So the first person to speak, as

22   between you and Officer Pittman, was you speaking

23   to Officer Pittman?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 84

1      A.      Yes, sir.

2      Q.      And that was the first time there had

3  been any kind of contact between either you or your

4  father-in-law and Officer Pittman?  You indicated

5  it?

6      A.      I talked to him.

7      Q.      Okay.

8      A.      I was standing 20 feet from him.

9      Q.      Right, but you initiated the contact?

10     A.      If that's what you want to call

11  contact.  Contact is what I call when, you know, I

12  physically reach over and grab you.

13     Q.      You  --

14     A.      That's contact.

15     Q.      Okay.  You initiated the speaking

16  between you-all?

17     A.      Yes, sir.  Now that will work.

18     Q.      All right.  And you told Officer

19  Pittman where the Florida line was?

20     A.      Yes, sir.

21     Q.      Why were you telling him that?

22     A.      Because they took my wife and

23  sister-in-law across the state line.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 87

1          Q.      Well, what exactly did Officer

2    Pittman say?

3          A.      Excuse me, ma'am.  He told me it

4    wasn't none of my fucking business where the state

5    line was.  They was chasing a fugitive, and it

6    didn't matter how far they had to go.  They was

7    catching the son of a bitch and bringing him back.

8          Q.      And he's referring to the guy that

9    just wrecked his patrol car?

10         A.      Yes, sir.

11         Q.      Okay.  All right.  Anything wrong

12   with that?

13         A.      Not to me --

14         Q.      Okay.

15         A.      Other than my wife was down there.

16         Q.      Your wife wasn't there when you had

17   this conversation with Officer Pittman?

18         A.      No.

19         Q.      Okay.  She had already gone off with

20   the other two officers?

21         A.      Right.

22         Q.      All right.  What happened next after

23   you -- you told Officer Pittman where the state

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 88

1    line was, and he basically told you he didn't care?

2          A.    Mr. Hobby was standing right about

3    even with Officer Pittman then.  And when he made

4    that statement to me, Mr. Hobby told him it was

5    something to him because it was his vehicle and his

6    two daughters in it and my wife -- before I could

7    say anything.

8          Q.    Okay.  Hold on.  Hold on.  Take it

9    one step at a time.  When you say -- when you say

10   Mr. Hobby was standing even with Officer Pittman,

11   are you saying within arm's length?

12         A.    No, sir.

13         Q.    What do you mean by "even"?

14         A.    He was about 5 foot from him.  He was

15   coming on around him just like me.  We done figured

16   out that he was mad about something by what he said

17   to me, so Mr. Hobby was trying to come on around

18   him, and --

19         Q.    What do you mean "come on around

20   him"?  Where was he going?

21         A.    He was coming right there with me to

22   get in the shade.

23         Q.    Where was --

Page 89

1      A.      He had fell behind me walking.

2      Q.      Where was the shade in reference to

3   --

4      A.      On the other side of the road.

5      Q.      On the other side of what road?

6      A.      Whatever road that is.

7      Q.      The dirt road --

8      A.      I do not know.

9      Q.      Or the county road?

10     A.      The county road.

11     Q.      All right.  Let me give you --

12     A.      There was no shade on the --

13     Q.      All right.  I will give you a piece

14  of paper and a pen.  And if you would, just kind of

15  show me how everything was laid out out there and

16  where the car was --

17     A.      All right.  This is Highway 4.

18  Highway 4, okay.  The dirt road basically goes off

19  like this.  You got Yellow River bridge right

20  here.  Okay, that little fishing road you are

21  talking about, it goes off right down through here

22  like this.  Then you can go down there and turn

23  around and come back right back by where

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 90

1    Mr. Pittman was stuck right here on the thing.  And

2    I don't know if he was mad about not being in on

3    the chase or whatever.  But anyway when he did get

4    unstuck -- and we was put off here, which is

5    probably -- I don't know, 500 feet, something like

6    that --

7        Q.     You-all were up by the bridge?

8        A.     You said you went down there.

9        Q.     I'm -- I'm recognizing the drawing.

10       A.     We was right there at the bridge when

11   they put us off.  I had to take him down that steep

12   bank, and he was already wore out.

13       Q.     All right.  Hold on right there.  Let

14   me -- let me -- because we got to make sure we got

15   it all accurate.  Can you write "fishing road"

16   where you drew fishing road?

17       A.     Yes, sir.  If that's what you want to

18   call it.  There's the fishing road.

19       Q.     All right.  And can you put another

20   line to show the other side of the bridge?  So you

21   know you got a line where the bridge starts.  Put a

22   line where the bridge ends.  Is that what that --

23   is this line supposed to be where the bridge

**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trial Services

Page 91

1    begins?

2        A.    No, that's where they put us off at.

3    I was just putting that line there as Yellow River

4    bridge.

5        Q.    Okay.

6        A.    That's where they put us off at, and

7    I was telling you we had to walk down here --

8        Q.    Don't -- don't put dots everywhere

9    that you don't intend to show a specific thing,

10   okay?  That's going to make it hard to understand

11   later.  You see what I'm saying?  Don't just tap

12   the thing.  We got -- we want to show specific

13   things on here so we can make sure we got it

14   accurate, okay?

15       A.    Okay.

16       Q.    All right.  You -- you've drawn

17   Highway 4.  At the time you were flagged down by

18   Officer Snow and Officer Abraham, you were going

19   toward the bridge?

20       A.    Right.

21       Q.    You had not crossed the bridge yet?

22       A.    No.

23       Q.    And it was right at the point around

Page 92

1    the bridge where you -- you-all got -- you and

2    Mr. Hobby got out of the car?

3         A.     Right.

4         Q.     And Officer Snow and Officer Abraham

5    got in the car?

6         A.     Right.

7         Q.     And then the car turned around and

8    went back to the dirt road?

9         A.     Right.

10        Q.     Let's write "Walker Road" on there

11   because that's actually the name of the road.

12        A.     Okay.

13        Q.     And so your wife, Tina Scofield,

14   drove Ms. Copley, Officer Snow, and Officer Abraham

15   back to Walker Road and then south on Walker Road?

16        A.     Whichever way it goes.  I reckon that

17   would be south.

18        Q.     I think Florida is to the south when

19   you are in Alabama, right?

20        A.     Well, southeast or you know northeast

21   or whatever.  It's probably southeast is what I'd

22   guess.

23        Q.     Well, they went down Florida -- they

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 93

1    went down Walker Road toward Florida?

2         A.      Yes, sir, they went down that dirt

3    road.

4         Q.      And you couldn't see them anymore?

5         A.      No, sir.

6         Q.      All right.  And then you said you and

7    Mr. Hobby were up on County Road 4 and wanted to go

8    down toward the police car.  Can you show -- I'm

9    going to give you a different color pen now, a red

10   pen, and I'd like you put a square where the police

11   car was wrecked, or where you first saw it, and

12   then an "X" where it was after it moved.

13        A.      Okay.  He was somewhere right along

14   here, just like I got it marked in black.

15        Q.      Okay.

16        A.      If you went down there, you know

17   exactly where I'm talking about because --

18        Q.      I know where you're talking about.

19        A.      -- there's tire marks and all still

20   there.

21        Q.      I -- I -- I know.  But there may be

22   people who haven't been down there who are going to

23   try to look at your map, so we want to get this map

Page 94

1      accurate.   Put a square --

2          A.      No, this map may not be accurate

3      because I'm not a -- I don't make maps for a

4      living.

5          Q.      Put a square where -- approximately

6      where the police car was when it was wrecked before

7      the officer moved it.  Okay.  Now put an -- an "X"

8      -- using the red pen for the square.  Now also use

9      the red pen for the "X" and put an "X" where the

10     police car was parked after the officer got it

11     freed up.  Okay.  Now let me give you a green pen

12     and get you to circle the area where the shade was

13     that you said you and Mr. Hobby were trying to get

14     to.  Okay.  The shade is up by County Road 4?

15         A.      Uh-huh.

16         Q.      Is that yes?

17         A.      Yes.

18         Q.      Okay.

19         A.      It's across County Road 4 from the

20     bridge.

21              MR. PIKE:  I'm going to put

22     Defendant's Exhibit 7 as a sticker on this.

23              (WHEREUPON, a document was marked

Page 95

1                              as Defendant's Exhibit 7 and is

2                              attached to the original

3                              transcript.)

4          Q.      (Mr. Pike)  And Defendant's Exhibit 7

5     is a -- is the exhibit where you have been drawing

6     your diagram, correct?

7          A.      Yes, sir, but --

8          Q.      All right.  Can you -- can you

9     initial that at a bottom corner, please.

10                             THE DEPONENT:  Is that all right,

11    Matt.

12         Q.      (Mr. Pike)  And if you would, put

13    "shade" because that green is not showing up real

14    good on this yellow paper.  All right.  Your circle

15    is over the -- the -- the "HWY" letters in Highway

16    4, and you have written "shade" beside it, and

17    that's where the shade was.  Okay.  You can -- I

18    will take this pen now.  All right.  So you're

19    trying -- you've gone down the bank.

20         A.      The back?

21         Q.      The bank of the road?

22         A.      Yes, sir.

23         Q.      Going down toward the fishing road?

Page 96

1    A.    Yes, sir.

2    Q.    And then you've told Officer Pittman

3    where the state line was, and he's basically told

4    you that it doesn't --

5    A.    Well, we had to walk up to where

6    Officer Pittman's car was parked.

7    Q.    Is that where the red "X" is?

8    A.    Uh-huh.

9    Q.    Is that yes?

10   A.    Yes, sir.

11   Q.    So --

12   A.    He was sitting on County -- Walker

13   Road then.

14   Q.    So the first time there's any

15   conversation back and forth between you, Officer --

16   you and Officer Pittman was after he had already

17   gotten his car unstuck and moved it over to Walker

18   Road?

19   A.    Yes, sir.

20   Q.    Where the red "X" is?

21   A.    Yes, sir.

22   Q.    All right.  And at that point where

23   Officer Pittman's car is already parked where the

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 97

1    red "X" is, you told him where the state line was?

2        A.    Yes, sir.

3        Q.    And he told you basically that he

4    didn't care because they were pursuing a fugitive?

5        A.    Right.  But not in that -- you know.

6        Q.    Well, you told me the words he used

7    earlier?

8        A.    Yes.

9        Q.    All right.  And then you say

10   Mr. Hobby was about 5 feet from Officer Pittman

11   when that conversation occurred?

12       A.    Yes, sir.

13       Q.    And -- and where did Mister -- what

14   did Mr. Hobby do then?

15       A.    He stopped.

16       Q.    He stopped.  What did he --

17       A.    When he told me, when he started

18   cussing me, Mr. Hobby stopped and told him that it

19   was some of his business because he owned the

20   vehicle and that was his two daughters and my wife,

21   and Mr. Pittman told him he would arrest him for

22   interfering in a police whatever --

23       Q.    Okay.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 99

1        A.      No, sir, I don't reckon.

2        Q.      He wasn't involved in flagging down

3   your vehicle?

4        A.      No, sir.

5        Q.      As far as he knew, you-all could have

6   just walked up from having been fishing down there

7   at the bank, or the creek?

8        A.      No, sir, I don't think so.

9        Q.      Well, why did he say that?

10        A.      I think he was a little bit more

11   intelligent than that.

12        Q.      Okay.  I want to know specifically

13   why you say Officer Pittman knew who you were,

14   where you come from?

15        A.      Well, he was standing outside of his

16   car there one time trying to get it unstuck

17   whenever they commandeered the vehicle.

18        Q.      Were you looking at Officer Pittman

19   while they were commandeering the vehicle, in your

20   words?

21        A.      Yes, sir.

22        Q.      So you were watching Officer Pittman,

23   you weren't watching Officer Snow and Officer

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 100

1    Abraham or your wife?

2        A.    They had done gone.  I was trying to

3    get Mr. Hobby down that hill.  You said you went

4    out there, so you know there's a steep hill going

5    off of Highway 4.

6        Q.    That's not what I asked you.  I asked

7    -- I asked you if you were watching Officer Pittman

8    while they were commandeering your vehicle on the

9    highway?

10       A.    I was -- yes, I was watching him

11   trying to get out of that ditch.

12       Q.    And what was he doing?

13       A.    He was revving up the motor, ramming

14   it in drive, and then ramming it in reverse.

15       Q.    So he was in his car while Officer

16   Snow and Officer Abraham were getting the vehicle

17   you had been driving in?

18       A.    Yes, sir.

19       Q.    So he wasn't out of his car watching

20   where you-all --

21       A.    He stopped one time and got out of

22   his car because he didn't think that he was going

23   to be able to get it out.  Then he got back in it,

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 106

1      A.      No, sir.

2      Q.      And instead of telling me what you

3   think somebody knew, I'd like you to confine your

4   testimony as to what you know, okay?  And not --

5   don't jump ahead and conclude what was in somebody

6   else's mind unless you consider yourself to be a

7   mind reader, okay?

8      A.      Okay.

9      Q.      And we will get through a lot

10  faster.  I'm asking you:  Was Officer Pittman in

11  that patrol car trying to get it unstuck when

12  Officer Snow and Officer Abraham were flagging down

13  the car you were driving in?

14     A.      Yes, sir.

15     Q.      The first time Officer Pittman saw

16  you and your father-in-law was when you-all were

17  walking down the highway --

18     A.      No, sir, we did not walk down the

19  highway.

20     Q.      Walking down the slope of the bank?

21     A.      Yes, sir.

22     Q.      Okay.  The first time Officer Pittman

23  saw you and your father-in-law was when you-all

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 107

1    were walking down the slope of the bank after the

2    other two officers had already left with your wife

3    and your sister-in-law?

4        A.    Yes, sir.

5        Q.    So he doesn't know whether you came

6    out of a car, he doesn't know whether you were

7    walking down the road --

8              MR. BRUNSON:  Object to the

9    form.  You -- you just admonished him not to talk

10   about what he does or doesn't know, so he couldn't

11   know what --

12       Q.    (Mr. Pike)  You don't have any -- you

13   don't have any basis for knowing what Officer

14   Pittman knew?

15       A.    No, sir.

16       Q.    Okay.  You don't have any further

17   information of what Officer Pittman saw beyond the

18   first time he saw you and your father-in-law

19   walking down the bank?

20       A.    No, sir.

21       Q.    Okay.  So right now all we know is

22   that you and your father-in-law, two guys that

23   Officer Pittman has just seen walking down the bank

Page 108

1      of the road, approach him telling him where the

2      state line is?

3              A.      Yes, sir.

4              Q.      Because you felt like you needed to

5      inform the police officer where the state line was?

6              A.      Yes, sir.

7              Q.      And he told you basically that he

8      didn't care --

9              A.      Uh-huh.

10             Q.      -- and they were pursuing fugitives?

11             A.      Uh-huh.

12             Q.      And that was the truth, wasn't it?

13             A.      I reckon.  Like you said, I'm not a

14     mind reader.  I don't know -- I didn't know if

15     there was a fugitive back there or not.

16             Q.      All right.  But he's the policeman

17     there, right?

18             A.      Yes, sir.

19             Q.      And you're not a policeman?

20             A.      No, sir.

21             Q.      And neither is your father-in-law?

22             A.      No, sir.

23             Q.      And when Officer Pittman told you-all

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 109

1    that he didn't care and that they were pursuing

2    fugitives, your father-in-law had words with him?

3        A.    He had words first.

4        Q.    What did your father-in-law say after

5    Officer Pittman told you that they basically didn't

6    care where the state line was and that they were

7    going to catch that fugitive?

8        A.    He said he did care because it was

9    his vehicle and that it was his daughter's and my

10   wife --

11       Q.    Was your father-in-law holding a

12   cane?

13       A.    -- and it was his vehicle.  Yes, sir.

14       Q.    Were you holding a cane?

15       A.    Yes, sir.

16       Q.    So we got two men with canes that

17   have approached the officer?

18       A.    No, we didn't approach -- I didn't

19   approach the officer with my cane.

20       Q.    You said your father-in-law was in 5

21   feet of the officer?

22       A.    Yes.

23       Q.    Your father-in-law was within 5 feet

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 110

1     of the officer with his cane?

2          A.     Yes, sir.

3          Q.     And did -- when you're saying you

4     didn't approach the officer with your cane, are you

5     saying you put your cane down at some point?

6          A.     Yes, sir.

7          Q.     When?

8          A.     When I told him to get his hands off

9     of him.

10         Q.     You put your cane down before you

11    grabbed the officer?

12         A.     Yes, sir.

13         Q.     But your father-in-law was holding

14    the cane when he was speaking to the officer?

15         A.     He was holding his cane.  His cane is

16    a blind cane about that big around.  You should

17    know what a blind cane is.

18         Q.     Why are you telling me that?

19         A.     Well, a man with your education and

20    all should know.

21         Q.     So what?  Why are you telling me

22    that?

23         A.     Well, I was just telling you --

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 112

1    Q.    And he tells the officer that he does

2  care where the state line is because his daughter

3  is driving and it's his car.  What happens next?

4    A.    Yes, sir.

5    Q.    What happened next?

6    A.    Officer Pittman hold Mr. Hobby that

7  he would arrest him for some kind of obstruction of

8  justice or something.

9    Q.    After Officer Pittman said that, what

10  was the next thing that happened?

11    A.    Mr. Hobby, Officer Pittman stepped

12  towards him and reached to get his arm, and

13  Mr. Hobby felt him touch his arm, and naturally he

14  snatched back.  Then Mr. Pittman --

15    Q.    Hold on a second before we get to

16  that.  You said Officer Pittman told Mr. Hobby that

17  he would arrest him?

18    A.    Yes, sir.

19    Q.    And then you jumped to Officer

20  Pittman actually trying to arrest Mr. Hobby?

21    A.    No, sir.

22    Q.    You said he reached out and grabbed

23  his arm?

Page 115

1      Q.      Which road?

2      A.      Walker Road.

3      Q.      And where was the other guy that you

4   say you were talking to?

5      A.      He was on this side of Walker Road.

6   He was in the shade.  That's where me and Mr. Hobby

7   was headed until --

8      Q.      When you said "this side", you're

9   talking about this side of opposite -- of Walker

10  Road that's opposite to where the river is?

11     A.      Yes, sir, can I -- do you want me to

12  do it like this and make Walker Road, and then I

13  can write "shade" over here on this side?

14     Q.      That will be fine.  All right.  You

15  have written "shade" in -- with the black marker,

16  and that's where that man was --

17     A.      Yes, sir.

18     Q.      So were you talking to that man and

19  talking to the -- Officer Pittman basically at the

20  same time?

21     A.      No, sir.  I was walking in the middle

22  the road, that fellow asked me what was going on,

23  and I was telling him.  Then I heard the

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 116

1    confrontation between Mr. Hobby and Officer Pittman

2    after I told him that the state line was down

3    there, and he told me what I told you-all a while

4    ago, and then --

5        Q.     You went back to talking with the

6    man?

7        A.     No, sir, I didn't have time.  Like I

8    told you, Mr. Hobby said it was his vehicle and

9    his --

10       Q.     All right.  I'm going to take a piece

11   of paper, and let's get this in order.  All right.

12   Number 1, who was the first person you talked to

13   out there besides Robert Hobby?

14       A.     Neil Pittman.

15       Q.     Before you ever talked to that other

16   man, you talked to Neil Pittman?

17       A.     I told him that the county line was

18   right down there, and he told me --

19       Q.     That -- that's not my question, what

20   you told him.  My question is:  Who did you talk to

21   first, Officer Pittman or the other man?

22       A.     I don't remember.

23       Q.     Okay.  So you don't remember who you

**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trial Services

Page 121

1     Q.      What profanity did Mr. Hobby use

2   toward Officer Pittman before Officer Pittman

3   arrested Mr. Hobby?

4     A.      He told him that that was his truck

5   and that it was some of his "F"ing business because

6   his daughters was in the truck, and my wife was one

7   of them.  He said that before I could tell Officer

8   Pittman that my wife was in there.

9     Q.      All right -- did Mr. Hobby use the

10   word "F"ing, or did he say fucking?

11     A.      That's what he said.

12     Q.      Which?

13     A.      The fucking.

14     Q.      All right.

15     A.      I hate to use that word with ladies

16   present.

17     Q.      What did Officer Pittman say in

18   response to Mr. Hobby's statement?

19     A.      He told him he'd arrest him for

20   obstructing justice, or something like that.

21     Q.      What happened next?  What's the very

22   next thing that Mr. Hobby did or Officer Pittman

23   did?

Page 124

1    you were talking to the bystander?

2        A.      Yes, sir.  After I told him that the

3    Florida line was down there, the bystander asked me

4    what was going on, and I told him I didn't know,

5    and he said it was his land and all that we was on,

6    and then Mr. Hobby and Officer Pittman started up.

7    So naturally I turned around to see what was going

8    on with that confrontation after I heard him say

9    that -- what they said, and then Officer Pittman

10   reached to grab Mr. Hobby, and Mr. Hobby snatched

11   back.  And when he did, Officer Pittman claimed

12   that he swung his cane at him, which he couldn't

13   hit him if he had swung his cane at him because he

14   can't see that good.  And then Officer Pittman

15   picked him up bodily -- I'm talking about slam off

16   the dirt -- and threw him in the back of that

17   open-trunk police car.

18       Q.      Okay.  We're going to get to all

19   that.  If I heard you correctly, what you just told

20   me was that you had told Officer Pittman where the

21   state line was; Officer Pittman had told you he

22   didn't care; and then you went back to talking to

23   the bystander again?

Page 131

1      A.      No, sir.  I told you I stopped him in

2   the middle of the road.

3      Q.      Were you talking to the bystander at

4   the point Officer Pittman told Mr. Hobby that he

5   could arrest Mr. Hobby?

6      A.      No, sir.

7      Q.      Then if you weren't, how could that

8   have been what made you stop talking to the

9   bystander?

10      A.      Because he was offering --

11          MR. BRUNSON:  I think -- I think

12   --

13      A.      -- to arrest --

14          MR. BRUNSON:  -- what he's trying

15   to say is that he exchanged a salutation with the

16   bystander, and it all happened that they have an

17   in-depth length of conversation.

18          MR. PIKE:  Well, he's got to say

19   what he's trying to say.  He's got to say what he's

20   trying to say.

21      A.      I told you 30 times.

22      Q.      (Mr. Pike)  You told me you were

23   talking to the bystander up until the point where

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 132

1  you heard Officer Pittman tell Mr. Hobby that he

2  could arrest Mr. Hobby?

3        A.      Right.  And I was standing in the

4  middle of the road, which was about 10 foot from

5  the police car.

6        Q.      And talking to the bystander?

7        A.      No, sir.  I told you I quit talking

8  to the bystander when --

9        Q.      At what point?

10       A.      -- Mr. Pittman and Mr. Hobby started

11  having their confrontations.

12       Q.      So you quit talking to the bystander

13  after you told Officer Pittman where the state line

14  was?

15       A.      Right.

16       Q.      So you talked to the bystander some

17  more after you told Officer Pittman where the state

18  line was?

19       A.      No, I didn't talk to the -- I stopped

20  in the middle of the road because Mr. Hobby made

21  his statement, then Officer Pittman told him that

22  he could arrest him.

23       Q.      He would arrest him or could arrest

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 147

1     after Officer Pittman said that he could arrest

2     Mr. Hobby, but before Officer Pittman tried to grab

3     Mr. Hobby?

4          A.     Yes.

5          Q.     All right.  What did Mr. Hobby say to

6     Officer Pittman before Officer Pittman tried to

7     grab Mr. Hobby?

8          A.     He told him that it was some of his

9     fucking business, that the truck was his, it was

10    his two daughters and my wife.

11         Q.     Was Mr. Hobby holding the cane at

12    that time?

13         A.     Yes, sir.

14         Q.     What was he doing with the cane?

15         A.     Nothing, he was just holding it.

16    That's the only way he can stand up without

17    somebody getting him by the arm.

18         Q.     He uses the cane to stand?

19         A.     To help him get along.  He's legally

20    blind.

21         Q.     Well, you just told me that he used

22    it to stand up.  Those were your words.  You want

23    to --

**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trial Services

Page 149

1      Q.    So Mr. Hobby does not use the cane to

2  support his weight?

3      A.    Sometimes he has to use it a little

4  to support his weight.

5      Q.    Is it a blind person's cane or a

6  weight-bearing cane?

7      A.    It's a blind person's cane.

8      Q.    It's not the kind of cane that's

9  designed to bear weight?

10      A.    He can bear some weight with it.  He

11  also uses it to keep his balance.

12      Q.    What was Mr. Hobby doing with the

13  cane when he was speaking to Officer Pittman and

14  telling him that it was his car?

15      A.    Nothing.

16      Q.    He was holding the cane, wasn't he?

17      A.    Yes, sir.

18      Q.    In which hand?

19      A.    In his left one.

20      Q.    Which cane -- which hand were you

21  holding your cane in?

22      A.    My right one.

23      Q.    Were you standing -- where were you

Page 150

1    standing in relation to Officer Pittman while --

2        A.    I was standing about 10 feet away

3    from him in the middle of the -- this road.

4        Q.    Walker Road?

5        A.    Yes, sir.

6        Q.    While Officer Pittman was speaking to

7    Mr. Hobby, you were standing 10 feet away from

8    Officer Pittman?

9        A.    Yes, sir.

10              MR. PIKE:  Let's change tapes.

11              VIDEOGRAPHER:  This marks the end

12   of Tape No. 2 in the deposition of Clyde Scofield.

13   Off the record.  The time is 12:10 p.m.

14              12:10 p.m.

15              (Short break.)

16              12:11 p.m.

17              VIDEOGRAPHER:  This is the

18   beginning of Tape No. 3 in the deposition of Clyde

19   Scofield.  Back on the record.  The time is

20   12:11 p.m.

21       Q.    (Mr. Pike)  Mr. Scofield, do you

22   understand you are still under oath?

23       A.    Yes, sir.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 151

1          Q.      Where was Officer Pittman standing in

2     relation to his patrol car when he was speaking

3     with Mr. Hobby?

4          A.      He was standing at the trunk of it.

5          Q.      All right.  I'm going to take this

6     yellow piece of paper, and I'm going to draw a

7     patrol car, and I'm going to put a -- an arrow on

8     the front of the car to indicate the front.

9          A.      Okay.

10              MR. PIKE:  We're going to make

11    this Defendant's Exhibit No. 8.

12                  (WHEREUPON, a document was marked

13                  as Defendant's Exhibit 8 and is

14                  attached to the original

15                  transcript.)

16         Q.      (Mr. Pike)  Can you point to where

17    Officer Pittman was standing when he was speaking

18    to Mr. Hobby?

19         A.      Right there.

20         Q.      And is that also where Officer

21    Pittman was standing where he was speaking to you?

22         A.      Yes.

23         Q.      So if I put a "P" where your finger

Page 153

1    Q.    Was the trunk of Officer Pittman's

2  car open or closed when you first spoke to Officer

3  Pittman?

4    A.    It was open.

5    Q.    So Officer Pittman did not open his

6  trunk for the special purpose of putting Mr. Hobby

7  or you in it?

8    A.    I don't know why he opened it.

9    Q.    But before any words were exchanged

10  between you or Mr. Hobby on the one hand and

11  Officer Pittman on the other, Officer Pittman had

12  already opened his trunk?

13    A.    Yes, sir.

14    Q.    And then you spoke to Officer

15  Pittman, and then Officer -- and then Mr. Hobby

16  spoke to Officer Pittman?

17    A.    Yes, sir.

18    Q.    What was the last thing Officer

19  Pittman said to Mr. Hobby before Officer Pittman

20  reached to grab Mr. Hobby?

21    A.    I don't remember.

22    Q.    What was the last thing Mr. Hobby

23  said to Officer Pittman before Officer Pittman

Page 154

1    reached to grab Mr. Hobby?

2        A.    I think he told him he "F"ing wasn't

3    going to arrest him.

4        Q.    Mr. Hobby told Officer Pittman that

5    Officer Pittman "F"ing wasn't going to arrest

6    Mr. Hobby?

7        A.    Uh-huh.

8        Q.    Is that yes?

9        A.    Yes, sir.

10        Q.    And -- but when you say "F"ing, what

11    you really mean is Mr. Hobby told Officer Pittman,

12    quote, you're not going to fucking arrest me, close

13    quote?

14        A.    Right.

15        Q.    Is that a correct statement of what

16    Mr. Hobby said to Officer Pittman?

17        A.    I don't know.  That's pretty close.

18        Q.    That's your memory?

19        A.    Yes, sir.

20        Q.    What was the next thing that happened

21    after Mr. Hobby made that statement?

22        A.    Mr. Pittman grabbed him and throwed

23    him in the trunk bodily.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 161

1    statement anybody made before Officer Pittman

2    touched Mr. Hobby?

3              MR. BRUNSON:  Object to the

4    form.  It appears to me from his testimony he

5    touched him twice.  Which one of those occasions is

6    it that you're talking about?

7              MR. PIKE:  Before there was any

8    contact, ever, in the history of mankind.

9         Q.    (Mr. Pike)  Before Officer Pittman

10   ever touched Robert Hobby in his entire life, what

11   was the last thing anybody said?

12        A.    Officer Pittman told him he could

13   arrest him for obstruction of justice.

14        Q.    And then touched Mr. Hobby?

15        A.    He reached to grab Mr. Hobby on the

16   arm.

17        Q.    Did he grab him?

18        A.    No, Mr. Hobby snatched his arm away.

19        Q.    Did Mr. Hobby snatch his arm away

20   before Officer Pittman was able to touch Mr. Hobby?

21        A.    Officer Pittman touched Mr. Hobby to

22   make him flinch and grab his arm and pull it away.

23        Q.    So Officer Pittman did touch

Page 164

1    what's his name --

2        Q.      Pittman?

3        A.      Yes, Pittman -- Mr. Hobby told him

4    that it was some of his "F"ing business because his

5    daughters was on there, and it was his truck, and

6    my wife was on there, and Mr. Pittman informed him

7    that he could arrest him for obstruction of

8    justice.

9        Q.      So earlier when you told me that

10   Mr. Pittman threatened to arrest Mr. Hobby before

11   Mr. Hobby ever said anything to him, and I said --

12   is that your story, are you sticking to that?  Yes,

13   yes, yes.  Now you are saying that Mr. Hobby spoke

14   to Mister -- Officer Pittman before Officer Pittman

15   threatened to arrest him?

16       A.      Yes.

17       Q.      Okay.  So that's not your story way

18   back, you're not sticking to it?

19       A.      I don't know what the story is now.

20   I don't think nobody else in this room knows what

21   the story is because you have --

22       Q.      That's why we do it on video.

23       A.      Because, you know.

Page 166

1    but Mr. Hobby told him that it was some of his

2    "F"ing business because it was his truck, his

3    daughters, and my wife.

4        Q.      I'm asking about the touching.  You

5    didn't tell me anything about that.

6        A.      That's -- no.  You asked me what

7    happened before he touched Mr. Hobby.

8        Q.      I asked you everything that happened

9    the first time Officer Pittman touched Mr. Hobby.

10       A.      That's what happened.

11       Q.      Tell me about the touching.  Tell me

12   everything that happened involving the touching.

13       A.      Then he told him that he could arrest

14   him for obstructing justice, and he reached out to

15   grab Mr. Hobby on the arm.  Mr. Hobby instinctively

16   jerked his arm back, just like you would do if

17   somebody reached out to touch you and you hadn't

18   done anything.  And that's the first time that

19   Mr. Pittman touched Mr. Hobby.

20       Q.      Which arm did Officer Pittman reach

21   for Mr. Hobby with?

22       A.      The right.

23       Q.      And which -- which arm did Mr. Hobby

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 167

1    jerk back?

2         A.    His right.

3         Q.    What happened after Mr. Hobby jerked

4    his right arm bark?

5         A.    Mr. Pittman grabbed him up and

6    body-slammed him in the back of the car.

7         Q.    Were any words said after

8    Mr. Hobby --

9         A.    Yes, sir.

10        Q.    -- jerked his right arm back?

11        A.    Yes, sir.

12        Q.    What was said?

13        A.    He told him he "F"ing wasn't going to

14   arrest him.

15        Q.    Mr. Hobby told Mr. Pittman that?

16        A.    Yes, sir.

17        Q.    As he jerked his right arm back?

18        A.    Yes, sir.

19        Q.    And -- and after Mr. Hobby said that,

20   what happened?

21        A.    Mr. Pittman picked him up and throwed

22   him in the back of the police car.

23        Q.    Did Mr. Hobby take any actions to

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 186

1       Q.     Dust him off?

2       A.     When I  -- no, I didn't dust him off

3  because he didn't have no dust on him.

4       Q.     Well, did you say anything to Officer

5  Pittman?

6       A.     No, sir, I didn't have time.

7       Q.     What happened?

8       A.     I told you.  He grabbed me by the arm

9  and slung me up in the trunk on top of Mr. Hobby.

10      Q.     Did he tell you you were under

11  arrest?

12      A.     Not then.

13      Q.     Did you figure that out at some

14  point?

15      A.     Yes, sir.

16      Q.     When?

17      A.     When he snatched me out of the trunk

18  off top of Mr. Hobby and handcuffed me and put me

19  in the back of the police car.

20      Q.     So you say you landed in the trunk on

21  top of Mr. Hobby?

22      A.     Yes, sir.

23      Q.     What part of your body landed on top

Page 196

1    A.    No, sir.

2    Q.    Did Officer Pittman display any

3  weapon to you --

4    A.    No, sir.

5    Q.    -- other than his own bare hands?

6    A.    No, sir.

7    Q.    So the only force Officer Pittman

8  used on you was just his open hands?

9    A.    Yes, sir.

10    Q.    The only force Officer Pittman ever

11  used on Mr. Hobby all day long was just his open

12  hands, his bare hands?

13    A.    No, sir, he closed his hands whenever

14  he picked him up and slammed him in the back of

15  that trunk.

16    Q.    Okay.  Mr. Pittman never used force

17  on you other than his hands?

18    A.    No, sir.

19    Q.    Is that a correct statement?

20    A.    That's a correct statement.

21    Q.    Is it also a correct statement that

22  Mr. Pittman did not use any force on Mr. Hobby --

23  let me ask it a different way.  Is it also a

Page 197

1    correct statement that Officer Pittman did not use

2    any force on Mr. Hobby other than his hands?

3         A.      Yes, sir.

4         Q.      That's correct?

5         A.      That's correct.

6         Q.      And after Officer Pittman got you out

7    of the trunk, he took you over to the back seat and

8    seated you there in the car?

9         A.      Yes, sir.

10        Q.      And put handcuffs on you?

11        A.      Yes, sir.  He done that at the back

12   of the car.

13        Q.      Officer -- he didn't try to kill you?

14        A.      No, sir.

15        Q.      Officer Pittman didn't try to kill

16   Mr. Hobby?

17        A.      No, no.  No, sir.

18        Q.      And Officer Pittman didn't even put

19   handcuffs on Mr. Hobby?

20        A.      No, sir.

21        Q.      What was the next thing that happened

22   after you were placed in the back seat of the

23   patrol car?

Page 198

1          A.      I went into a seizure, and I don't

2    remember anything after that.

3          Q.      How do you know you went into a

4    seizure?

5          A.      Because I didn't remember nothing.

6          Q.      That's -- you don't even remember

7    having the seizure, you just know you blacked out?

8          A.      I just blacked out, I reckon.

9          Q.      Do you remember having the seizure?

10         A.      Yes, sir, I just told you I had it.

11         Q.      What memory do you have of the

12   seizure?

13         A.      I remember -- the only thing I

14   remember about after he got me out of the trunk was

15   he throwed me in the back seat of the car.

16         Q.      What's the next thing you remember

17   after being placed in the back seat of the car?

18         A.      Somebody picking my head up.

19         Q.      Were you still in the back seat of

20   the car?

21         A.      Yes, sir.

22         Q.      Is that when you regained

23   consciousness?

Page 200

1          A.     No, sir, I don't think so.

2          Q.     And was an ambulance called to tend

3     to your medical condition?

4          A.     Yes, sir.

5          Q.     And were you actually taken from the

6     scene to the hospital in an ambulance?

7          A.     Yes, sir.

8          Q.     So you were afforded medical

9     treatment at the scene?

10         A.     No, sir.  All they can do is pick me

11    up, check my blood pressure, and stuff like that.

12         Q.     Well, your medical treatment began at

13    the scene?

14         A.     Yes, sir.

15         Q.     And then continued in the hospital?

16         A.     Yes, sir.

17         Q.     And Mr. Hobby's medical treatment

18    began at the scene with an ambulance?

19         A.     Yes, sir.

20         Q.     And continued at the hospital?

21         A.     Yes, sir.

22         Q.     And the police allowed both you and

23    Mr. Hobby to go to a hospital before you went to

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 201

1    jail?

2        A.     Yes, sir.

3        Q.     And only after the doctor was

4    finished treating you and Mr. Hobby at the hospital

5    were you taken to jail?

6        A.     Yes, sir.

7        Q.     And you were not satisfied with your

8    doctor at the hospital?

9        A.     No, sir.

10       Q.     Why is that?

11       A.     Because he didn't do anything.  He

12   came in there and saw that I was in handcuffs and

13   turned around and walked out.

14       Q.     Who was the first person to come upon

15   the scene of this incident after Officer Pittman

16   first tried to grab Mr. Hobby?

17       A.     I don't know.

18       Q.     Who was the first person you ever saw

19   at the scene besides you, Mr. Hobby, Officer

20   Pittman, and that bystander?

21       A.     Nobody.

22       Q.     Well, at some point somebody lifted

23   your chin up and then came --

Page 209

1    not.

2        Q.      (Mr. Pike)  Is that true?

3        A.      Yes, sir, I didn't know when he left

4    or where he went.

5        Q.      So as far as you know, at the time

6    you touched Officer Pittman, it was just you,

7    Mr. Hobby, and Officer Pittman present?

8        A.      Yes, sir.

9        Q.      Officer Pittman didn't have any other

10   officers there to help him?

11       A.      No, sir.

12       Q.      And I believe I asked you these, but

13   I want to make sure we're clear.  Did Officer

14   Pittman ever draw a firearm?

15       A.      No, sir.

16       Q.      Did Officer Pittman ever draw a

17   baton?

18       A.      No, sir.

19       Q.      Did Officer Pittman ever draw pepper

20   spray?

21       A.      No, sir.

22       Q.      Did Officer Pittman ever draw a

23   Tazer?

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 210

1          A.      No, sir.

2          Q.      Did Officer Pittman ever draw any

3     weapons?

4          A.      No, sir.

5          Q.      What injuries do you claim to have

6     suffered during the incident?

7          A.      I just busted my head and my nose.

8          Q.      Those were not permanent injuries?

9          A.      No, sir, I don't reckon.

10         Q.      When you say you "busted your head",

11    describe what you mean by that.

12         A.      I mean my head was busted, my nose

13    was busted.

14         Q.      When you say "busted", you mean there

15    was a cut and blood came out?

16         A.      Yes, sir.

17         Q.      Do you mean anything else besides

18    busted?

19         A.      No, sir.

20         Q.      In other words, with regard to your

21    head, your skull was not cracked?

22         A.      No, sir, it was just the skin, I

23    reckon.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 212

1    Q.    As I understand it, that was -- that

2    CAT Scan was negative?

3    A.    Yes, sir.

4    Q.    So besides the Tylenol and the cup,

5    you did not receive or require any other further

6    medical treatment?

7    A.    No, sir.

8    Q.    And having taking your two Tylenol,

9    you fully recovered?

10   A.    Yes, sir.

11   Q.    Now what treatment did Mr. Hobby

12   receive at the hospital?

13   A.    I don't know.  They had me handcuffed

14   to the bed.

15   Q.    Were you in the same room with

16   Mr. Hobby?

17   A.    No, sir.

18   Q.    Were the two of you discharged at the

19   same time?

20   A.    I reckon.

21   Q.    Did you ride to the jail together in

22   the same patrol car?

23   A.    Yes, sir.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 235

1      Q.      A couple of years ago?

2      A.      Yes.

3      Q.      Okay.  Is -- is he a -- would you

4  consider him a healthy man?

5      A.      No, sir.

6      Q.      Is -- how -- how tall is -- is

7  Ms. Hobby?

8      A.      Gosh, about probably 5'6" or 5'7".

9      Q.      Okay.  Is he able to stand straight

10  and erect or does he stand --

11      A.      No, sir, he stoops.

12      Q.      Is -- and how much would -- would you

13  estimate that he weighs, or weighed at the time?

14      A.      Probably 200 pounds or less.

15      Q.      Okay.  Are -- would -- would -- would

16  you be intimidated by -- you -- are you intimidated

17  by Mr. Hobby's size or -- or physical abilities?

18      A.      No, sir.

19      Q.      What about Officer Pittman what --

20  how -- what kind of a -- what size fellow is he?

21      A.      He's a pretty good size fellow.

22      Q.      Is he bigger than you?

23      A.      I don't think so.  I mean, he's not

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376



DEFENDANT'S
EXHIBIT
7

PENGAD 800-631-6989



C.S.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 1

1           IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                   NORTHERN DIVISION

4

5

6    CASE NO.:  2:07-cv-579-MEF

7

8    CLYDE SCOFIELD, et al.,

9           Plaintiff(s),

10   vs.

11   CITY OF FLORALA, ALABAMA,

12   et al.,

13          Defendant(s).

14

15                                              .

16                        DEPOSITION OF

17                        PENNY COPLEY

18                        JOB NO. 1101-57590

19

20   BEFORE:   Victoria M. Castillo

21             Certified Court Reporter and

22             Notary Public

23             ACCR# 17, Expires 9/30/2008

Page 42

1    watching that stuff; and Daddy looked at me and

2    said -- do you want to go eat some catfish? I said

3    sure, because we all love catfish. And Clyde and

4    Tina knew of a restaurant where they served all you

5    can eat catfish. I don't remember no towns or

6    anything else, but we all four -- Dad and I -- I

7    drove to pick -- to pick Clyde and my sister, Tina,

8    up, and we all got together and went out to eat

9    catfish, and we didn't quite make it. The police

10   were standing out in the road doing this for us to

11   stop. We stopped. They said we need to confiscate

12   your vehicle. Well, I was trying to get out, and

13   Clyde and Daddy had gotten out. And when I got --

14   when the two police officers jumped in the back

15   seat, they said -- go, go, go. And I'm thinking

16   go, go, go, and the door slammed on my foot when my

17   sister was backing up to go down whatever that dirt

18   road is, and something went on the radio like --

19   officer down. I think they were talking about

20   Mr. Pittman's car. Anyway, the two officers that

21   got in the back seat told us to hurry up and go

22   back down this dirt road, and we went over the

23   Florida state line, and I started to get worried.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 43

1    I didn't know if the guy -- well, one of the

2    officer's remark was -- if you hear gunshots,

3    duck.  That's what he told me and my sister, and

4    I'm thinking I might die going chasing after this

5    fugitive.

6         Q.     Please continue.

7         A.     Okay.  After the two policemen got

8    out of the back seat -- they had already

9    apprehended the guy they said over the radio.  So

10   they got out of the back seat.  Me and my sister

11   were hot-rodding back up to my Dad and Clyde, and I

12   looked over, and I went -- oh, my God.  I said --

13   what is he doing -- is he trying to kill my Daddy?

14   Me and my sister jumped out of the truck, and Daddy

15   was going into a diabetic coma, and I was in shock

16   so I don't know a whole much -- whole bunch from

17   there.  But I did see Neil Pittman try to hit my

18   sister with that cane and said he'd kill her.

19        Q.     Please continue.

20        A.     That's pretty much it.  I don't

21   remember too much after that.  Like I said, my

22   memory isn't that great from being abused.

23        Q.     Do you remember any more about, you

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 45

1    and my sister screamed -- bring a Pepsi, bring a

2    Pepsi -- Daddy is going into a diabetic coma.  So I

3    ran my Pepsi over to the truck, and Neil Pittman

4    comes down with the cane right by my sister and

5    says -- I said leave him the fuck alone.  And that

6    was it.  I can't tell you any more.  I went into

7    shock.  It just blew me away.

8         Q.     You've told me all you remember?

9         A.     Right.

10        Q.     All right.  Let me go back, and I

11   want to walk through it step-by-step a little bit

12   and ask you a few more questions.  What kind of car

13   were you-all in that day?

14        A.     Nissan Xterra.

15        Q.     What color was that?

16        A.     White.

17        Q.     And you-all were going where?

18        A.     We were going to -- I don't know the

19   name of the town.  I just know we were going to eat

20   all you can eat catfish, and we were on Highway 4

21   going back, cutting across.

22        Q.     All right.  Now Officer Pittman was

23   not one of the officers that flagged you-all down?

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 46

1      A.      No.

2      Q.      It was Officer -- I think your

3  brother-in-law said it was Officer Snow and Officer

4  Abraham was there with him?  You don't know their

5  names?

6      A.      I don't know their names, I'm sorry.

7      Q.      Now you told me that you had opened

8  your door to get out of the Xterra when you-all

9  were flagged down, but that the door closed on you

10  when your sister, Tina, accelerated the car?

11     A.      Yes, to back up.

12     Q.      To -- to --

13     A.      -- to the road that we had to go

14  down.

15     Q.      You-all needed to back up and get

16  turned around to go down that dirt road?

17     A.      Yes.

18     Q.      And your sister, Penny, mashed the

19  accelerator and that closed the door on you?

20     A.      I'm Penny -- Tina.

21     Q.      I am sorry.  Your sister, Tina,

22  mashed the accelerator and that closed the door on

23  you?

**2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203**
**1-800-888-3376**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 47

1     A.     Yes.

2     Q.     So it wasn't an officer that grabbed

3  you and physically held you in the car?

4     A.     No.  No, they just didn't give us

5  time to get out.

6     Q.     Okay.  They were saying go, go, go --

7     A.     Right.

8     Q.     And so your sister, Tina, just

9  stomped the gas and you did have time to get out?

10    A.     That's right.  She slapped it into

11  reverse and hit the gas.

12    Q.     If your sister, Tina, would have

13  waited a little bit longer, would you have been

14  able to get out of the car you think?

15    A.     The officers wouldn't give any of us

16  -- he just let Clyde and my brother -- my Dad out.

17  My brother-in-law -- Clyde is my brother-in-law.

18  But he -- they didn't give me time to get out.

19  They were yelling go, go, go when I just put my leg

20  out.

21    Q.     I understand that there was some

22  urgency.  I guess what I'm getting at is:  Did the

23  officers specifically tell you that they wanted you

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 48

1    to stay in the car, or was there just not time for

2    you to get out?

3         A.    There just wasn't time for me to get

4    out.

5         Q.    Okay.  No officer actually told you

6    that you needed to stay in the car?

7         A.    No.  They just yelled go, go, go.

8    That's an insinuation we aren't having time to get

9    out.

10        Q.    Right.  And -- and no officer

11   actually told you that you had to stay in the car?

12        A.    No.

13        Q.    Did any officer actually tell your

14   sister, Tina, that she had to stay in the car?

15        A.    No.

16        Q.    The officer just said go, go, go, and

17   she --

18        A.    Go, go, go -- and we went.

19        Q.    Did you -- did you ever tell the

20   officers -- no, I want to get out?

21        A.    Didn't have time.

22        Q.    Right.  But so my question is though

23   but:  Did you actually ever tell the officers that

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 49

1   you wanted to get out and did not want to go?

2        A.     No.

3        Q.     Did your sister, Tina, ever tell the

4   officers that she did not want to go, that she

5   wanted to get out of the car?

6        A.     No, not that I know of.

7        Q.     You don't remember -- well, you were

8   present, weren't you?

9        A.     Uh-huh.

10        Q.     Is that yes?

11        A.     Yes, I'm sorry.

12        Q.     Tina never told the officers that she

13   did not want to go?

14        A.     I couldn't tell you what Tina did.

15   I -- like I said, I was scared.  I didn't know if

16   we were going to live or die through this incident,

17   but --

18        Q.     But you never heard -- you never

19   heard Tina say that, said that she did not want --

20        A.     Not with my own ears, no.

21        Q.     And you were present the whole time?

22        A.     Pretty much, yes.  Kind of in shock.

23   I'm not a violent person.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 50

1    Q.    The officers never threatened you or

2    your sister, Tina?

3    A.    No.

4    Q.    The officers did not keep the

5    vehicle?

6    A.    Well -- no.

7    Q.    And now you -- you were going to

8    correct something, and I think I know what you're

9    going to correct, so I'm going to let you do it.

10   You are talking about something with Officer

11   Pittman later, and I am just right now intending to

12   ask you about Officer Snow and Officer Abraham.

13   A.    Okay, okay.

14   Q.    So I will be a little better in my

15   question for you.

16   A.    Okay.

17   Q.    Officer Snow and Officer Abraham

18   never threatened you?

19   A.    No.

20   Q.    And Officer Snow and Officer Abraham

21   never threatened your sister, Tina?

22   A.    No.

23   Q.    Officer Snow and Officer Abraham

Page 51

1    didn't keep the Nissan Xterra?

2        A.      No.

3        Q.      They just had your sister and you

4    transport them from that place where they flagged

5    you down on County Road 4 to the place where the

6    car chase had ended and the suspect had been

7    arrested?

8        A.      Yes.

9        Q.      And the suspect was already under

10   arrest by the time you got there?

11       A.      Yes.  They told the two in the back

12   over the radios that they had apprehended the

13   suspect, and that's the words that were used.

14       Q.      Okay.  You were never in any danger

15   from the suspect?

16       A.      I don't have any idea.  We did know

17   if he had a gun or knife or --

18       Q.      Right.  But by the time you actually

19   got --

20       A.      -- run us off the road, or what.

21       Q.      Okay.  By the time you got there

22   though, the suspect was already apprehended?

23       A.      That I could tell, yes.  That's what

Page 52

1    they said over the radio.

2         Q.     So to your knowledge you were never

3    at the same location with any dangerous suspect who

4    was on the loose?

5         A.     Well, I don't know if the guy was

6    dangerous or not.  I didn't know him.

7         Q.     Right.  So -- so you never had any

8    reason to believe that you were in the presence of

9    a dangerous suspect who was still at large?

10        A.     Yes, we did think that until we got

11   there.  Once we got there and the two officers got

12   out, we left and went to pick up Clyde and my

13   father, and that's when --

14        Q.     Well, but before you got there, you

15   weren't in the suspect's presence, were you?

16        A.     Before we got there, no.

17        Q.     Okay.  So my question is:  You were

18   never actually in the presence of any suspect who

19   was not apprehended?

20        A.     Right, yes.  I'm sorry.

21        Q.     You were never actually in any danger

22   of being hurt by some suspect who was on the loose?

23        A.     Yes, I -- I felt like we might be in

Page 55

1  dropped them off, you-all did not stay around there

2  where the car chase had ended?

3       A.    No.  We went -- left -- as soon as

4  they got out, they told us to go back, so that's

5  what we did.  We turned around and went back.

6       Q.    Do you really have any complaints

7  about picking up the officers and driving them down

8  there where the chase need?

9       A.    Yes.  Because I feel that they put us

10 in the zone of danger, and we didn't know if this

11 guy had a gun, a knife, or if he was going to get

12 us with a vehicle.  He just -- just ran Mr. Pittman

13 over.

14      Q.    Now -- now he didn't -- none of the

15 officers actually asked you-all to try to

16 personally catch the suspect, did they?

17      A.    No.

18      Q.    They just wanted you to drive them to

19 the area where the suspect was?

20      A.    Yes.

21      Q.    And then they were going to try to

22 catch the suspect?

23      A.    Yes.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE MIDDLE DISTRICT OF ALABAMA

3                      NORTHERN DIVISION

4

5

6     CASE NO.:  2:07-cv-579-MEF

7

8     CLYDE SCOFIELD, et al.,

9            Plaintiff(s),

10    vs.

11    CITY OF FLORALA, ALABAMA,

12    et al.,

13           Defendant(s).

14

15

16                      DEPOSITION OF

17                      TINA SCOFIELD

18                              JOB NO. 1101-57582

19

20    BEFORE:    Victoria M. Castillo

21               Certified Court Reporter and

22               Notary Public

23               ACCR# 17, Expires 9/30/2008

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 36

1    A.    I believe so.

2    Q.    What time of day was it?

3    A.    Sometime around lunch.

4    Q.    Please tell me everything that

5    happened on June 25th, 2005.

6    A.    Myself, my father, husband, and

7    sister had left church and were on our way to

8    Brewton to eat lunch, and while on County Road 4

9    while crossing the Yellow River Bridge, we were

10   stopped by three policemen waving their hands at us

11   to stop.  I stopped and backed up off of the

12   bridge.  They told us that they were commandeering

13   our vehicle, that we needed to get out, and I

14   explained to them that we were all four disabled;

15   three of us had to walk with a walker and cane.

16   They told my husband and my father to get out of

17   the vehicle, and two of the deputy -- or policemen

18   jumped into the back seat and hollered for me to

19   drive.  They told me to hurry up.  I wasn't driving

20   fast enough, that they thought they had a policeman

21   hurt back there.  I was instructed to cross the --

22   into the Florida line, which at that point we saw

23   the two cars -- the, I guess, perpetrator, or

Page 51

1    Margaret, until she was nearly unconscious with her

2    neck on the edge of the sofa?

3        A.    I do recall that, that incident.

4        Q.    How many times has he done that?

5        A.    I can't -- I don't know.

6        Q.    What about trying to punch your

7    sister, Margaret, but missing and hitting your

8    sister, Penny?

9        A.    I am sure that's probably happened.

10       Q.    And then resisting arrest of when the

11   officer came that you-all called to come help

12   you-all?

13       A.    In resisting arrest, he does -- he

14   didn't get violent with the -- that I can

15   remember -- I don't recall him getting violent with

16   the officer.  He just said he wasn't going, and

17   they were calling that resisting.

18       Q.    Did he try to pull away when the

19   officer tried to handcuff him?

20       A.    Probably.

21       Q.    That's your memory?

22       A.    There again, I am -- I am not sure

23   exactly.

**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trial Services

Page 57

1      A.      You go from Glenn Chambers Road to

2  County Road 4, which takes you into Brewton.

3      Q.      And in your car was just you, your

4  father, your husband, and your sister, Penny Copley

5  -- is Copley the proper pronunciation?

6      A.      Copley.

7      Q.      Okay -- what kind of car was it?

8      A.      A -- I believe a Mitsubishi.  It's a

9  -- it was an SUV.

10      Q.      In one place I saw a reference to a

11  Nissan Xterra?

12      A.      That's -- they have had both.  I am

13  not sure which vehicle.

14      Q.      Whose car was it?

15      A.      My father's.

16      Q.      Robert Hobby owned the car?

17      A.      He owned it, yes.

18      Q.      Who was driving?

19      A.      I was.

20      Q.      Did your father have a driver's

21  license?

22      A.      No.

23      Q.      Why did he own a car?

Page 58

1      A.      So we could take him to doctors and

2   --

3      Q.      You were driving, your sister, Penny

4   Copley, was in the front passenger seat?

5      A.      Yes.

6      Q.      And your husband and father were

7   seated behind you in the back seat?

8      A.      Yes.

9      Q.      Which side of the car was your

10  husband seated on?

11     A.      I am not sure, but normally it would

12  have been the passenger side because of leg room,

13  but I honestly can't answer that to --

14     Q.      What was the first you noticed of the

15  police officers or the scene, what did you see?

16     A.      The first thing I noticed was a

17  police car with its hood and trunk open in a ditch.

18  That's -- and they -- the three police officers

19  were running up to the highway.  It's -- it's kind

20  of a -- it's at the river so it's downhill, and

21  they were running up to the road.

22     Q.      What direction --

23     A.      To stop us.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 59

1    Q.    What direction were you traveling --

2    north, southeast, east, or west?

3    A.    West.

4    Q.    You are going west, and have you

5    crossed the river?

6    A.    Not yet.

7    Q.    You are going toward the bridge?

8    A.    We were headed towards the bridge,

9    but by the time I stopped we were on the bridge,

10   about midway.

11   Q.    Were the officers on your right or

12   your left?

13   A.    On the left.

14   Q.    So they came running up, and you

15   stopped in the middle of the bridge?

16   A.    Yes.

17   Q.    And did you back up, or what

18   happened?

19   A.    Yes, I backed up.

20   Q.    And then how many officers came up to

21   the car?

22   A.    Three.

23   Q.    Who were they?

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 62

1    Q.    Okay -- but it was Tim Snow and Mike

2    Abraham that were flagging you down and getting in

3    the car?

4    A.    Yes.

5    Q.    Neil did not come up all the way up

6    to your car?

7    A.    No.

8    Q.    And Neil did not say anything to you?

9    A.    No.

10   Q.    Neil did not tell you to drive off

11   with Tim Snow or Mike Abraham?

12   A.    Neil didn't, no.

13   Q.    So really the -- the commandeering,

14   quote, unquote, of your vehicle was Tim Snow and

15   Mike Abraham, it was not Neil Pittman?

16   A.    No.

17   Q.    Am I correct about that?

18   A.    Yes.

19   Q.    So you drive off with Tim and Mike in

20   the car, and your father and your husband remain

21   behind on County Road 4?

22   A.    Yes.

23   Q.    Where -- where do you go, where do

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 63

1    you-all drive to with the officers in the car?

2         A.    We drove I don't know how far -- it

3    was a dirt road.

4         Q.    Was it Walker Road?

5         A.    I don't know.

6         Q.    Is it the little dirt road right

7    there before you get to the bridge on the left?

8         A.    Yes.

9         Q.    If that is Walker Road, that would be

10   the road?

11        A.    Yes.

12        Q.    Okay -- where did you go?  Did you

13   have to turn around or back up, or how did you get

14   to Walker Road?

15        A.    I had to back up just so -- far

16   enough that I could turn into the road.

17        Q.    Because by the time you get on the

18   bridge, you are already past that road?

19        A.    Yes.

20        Q.    So you had driven past the road, and

21   then you had to go back to it?

22        A.    Yes.

23        Q.    Tell me -- tell me what happened.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 64

1    A.    At that road?

2    Q.    Well, after you got onto Walker Road

3 and backed up and got on Walker Road?

4    A.    Okay -- I was driving down the dirt

5 road.  Tim told me to drive faster, and it was a

6 swervy road with -- in bad condition, so the

7 vehicle -- I was almost to the point of losing

8 control of it.  I was upset, not knowing what I was

9 going to -- and when we got there, I looked to the

10 right and saw the vehicles.  They -- the police

11 officer already had the man they were after in the

12 back seat of his car, and the police officer was

13 standing beside the car.

14    Q.    All right -- how far did you have to

15 drive?

16    A.    I don't know exactly.  I would say --

17 I am not good at guessing lengths -- but I would

18 say a mile, mile-and-a-half.

19    Q.    You drove from that area on the

20 bridge where you were flagged down about a mile, or

21 a mile-and-a-half?

22    A.    Something like that.

23    Q.    In your best estimate?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 65

1    A.    Yes.

2    Q.    And that would have taken you about

3    60 to 90 seconds?

4    A.    Yes.

5    Q.    Now at the point the officers flagged

6    you down, Officer Snow flagged you down with

7    Officer Abraham up there, they told you that the

8    suspect's car had already wrecked?

9    A.    They -- as I --

10    Q.    You told me earlier about a fire or

11    something like that?

12    A.    Yes -- yes, they thought one of the

13    vehicles -- the two vehicles had hit, and they

14    thought one -- the police car was on fire.

15    Q.    So in other words, by the time these

16    officers got in your and you drove off with these

17    officers in the car, they had told you the chase

18    was already over, that you were responding to the

19    location of the wreck?

20    A.    I am not sure. I don't -- I was

21    upset and scared, so --

22    Q.    You don't remember anybody telling

23    you that you were involved in an active police

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 72

1    County Road 4, is that where you went after you

2    dropped off Officer Snow and Officer Abraham?

3         A.    Yes.

4         Q.    Tell me about what happened as you

5    were approaching the location where you had dropped

6    off your father and your husband.

7         A.    There again, that's where I observed

8    my father -- Neil took the cane away from my

9    father.  My father was trying to hold on to the

10   cane because he's -- he's very off-balance, and

11   that was his only way of standing up.

12        Q.    Hold on a second -- you don't know

13   what was going on inside your father's head, do

14   you -- you can't read his mind?

15        A.    I -- no, I can't read his mind --

16        Q.    Okay -- so what you saw was --

17        A.    But I saw it.

18        Q.    The officer trying to take your

19   father's cane away, and your officer trying to hold

20   onto the cane?

21        A.    My father trying to hold onto it.

22        Q.    I am sorry -- yes -- what you saw was

23   the officer trying to take the can away from your

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 73

1   father and your father trying to hold onto it and

2   prevent the officer from doing that?

3          A.      So he could -- he was holding it on

4   the ground to try to stand up.  He was falling.

5          Q.      You saw your father falling?

6          A.      Yes.

7          Q.      Did he fall on the ground?

8          A.      Not completely because Neil grabbed

9   him.

10         Q.      Did you ever see the cane strike

11  Officer Pittman?

12         A.      It may have -- as my father was

13  trying to hold onto it, it possibly hit him on the

14  back of the leg, not hard.

15         Q.      Possibly -- did you see the cane hit

16  Officer Pittman or not?

17         A.      It looked like it.

18         Q.      It looked like --

19         A.      -- but it wasn't a swing.

20         Q.      You are saying it looked like the

21  cane that your father was holding struck Officer

22  Pittman?

23         A.      On the leg as it was -- as they were

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 74

1    going down.

2          Q.    On the leg, so that is a yes?

3          A.    Yes.

4                MR. PIKE:  Do you need to change

5    the tapes?

6                VIDEOGRAPHER:  Yes.

7                MR. PIKE:  Okay -- let's take

8    a -- we are going to take a break.

9                VIDEOGRAPHER:  This marks the end

10   of Tape No. 1 of the deposition of Tina Scofield.

11   Off the record.  The time is 10:40 a.m.

12                     10:40 a.m.

13                     (Short break.)

14                     10:47 a.m.

15                VIDEOGRAPHER:  This is the

16   beginning of Tape No. 2 in the deposition of Tina

17   Scofield.  Back on the record.  The time is

18   10:47 a.m.

19         Q.    (Mr. Pike)  Ms. Scofield, do you

20   understand you are still under oath?

21         A.    Yes.

22         Q.    If I understand your testimony

23   correctly, the first thing you saw when you

Page 75

1    returned to County Road 4 after you dropped off

2    Officer Snow and Officer Abraham was your father

3    holding his cane; the cane struck Officer Pittman

4    on the leg; Officer Pittman was trying to take away

5    the cane; and your father was trying to retain

6    control of the cane?

7                    MS. JARED:  And I objected.  I

8    don't believe that is not in the order in which she

9    said she observed that.

10                   THE DEPONENT:  No.

11        Q.    (Mr. Pike)  Right?

12        A.    That's not the order --

13        Q.    Okay -- explain --

14        A.    -- Debbie is correct.

15        Q.    Explain it to me then, please.

16        A.    They both had ahold of the cane --

17        Q.    Okay.

18        A.    -- together as I was pulling up.

19        Q.    They were wrestling to gain control

20    of the cane as you pulled up?

21        A.    I wouldn't call it wrestling.

22        Q.    What would you call it?

23        A.    My father was trying to hold onto it

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 76

1    as Neil was trying to pull it away, and my father

2    was losing his balance.

3         Q.    That was the first thing you saw when

4    you returned after dropping off Officers Snow and

5    Abraham?

6         A.    Yes.

7         Q.    You don't know what led up to that

8    moment in which you saw your father and Officer

9    Pittman struggling over control of the cane?

10        A.    Only what I was told.

11        Q.    You have no first-hand knowledge?

12        A.    No.

13        Q.    And anything you told would be

14   hearsay to you?

15        A.    Yes.

16        Q.    Okay -- did your father at any point

17   ever just hand the cane to Officer Pittman?

18        A.    I wouldn't say "hand the cane to

19   him".  Neil took it away as Daddy was falling.

20        Q.    I want to make sure I am clear --

21   Officer Pittman had to forcefully take the cane

22   away, your father never surrendered it to him

23   voluntarily that you saw?

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 77

1          A.      No, he couldn't.

2          Q.      Am I correct about that?

3          A.      Yes.

4          Q.      Now I thought earlier you said your

5     father wound up in the trunk of the car?

6          A.      He did.

7          Q.      And I am hearing falling also -- can

8     you explain?

9          A.      As my father was falling to the

10    ground, Neil literally picked him up and threw him

11    in the trunk of the car.

12         Q.      What was your father doing as he was,

13    in your words, thrown in the trunk of the car?

14         A.      He was passing out.

15         Q.      Well, that's -- I mean, where were

16    you located when you say your father was passing

17    out?

18         A.      I was -- by that time I was parked

19    and trying to get to them.

20         Q.      So the struggle over the cane lasted

21    long enough for you to arrive at the intersection

22    of the dirt road and County Road 4, park your car,

23    and get out?

**2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203**
**1-800-888-3376**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 79

1      A.      I wasn't there.

2      Q.      Okay -- what was your husband doing

3 when you first arrived back at the intersection of

4 the dirt road and County Road 4?

5      A.      He was walking towards my father and

6 Neil Pittman.

7      Q.      So that the --

8      A.      Or I should say almost running, a

9 fast walk.

10      Q.      So your father is walking fastly

11 toward where Officer Pittman is?

12      A.      My husband.

13      Q.      I am sorry -- your husband was

14 walking quickly toward where Officer Pittman was?

15      A.      The both of them, yes.

16      Q.      And -- and that was the point at

17 which Officer Pittman and your father were

18 struggling over the cane?

19      A.      They were finished -- I mean, he --

20 as I pulled up, I saw my father and Mr. Pittman

21 struggling over the cane, and my father losing his

22 balance at the same time my husband was trying to

23 get up to them, and that's when Neil threw my

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 80

1    father in the trunk.  I heard my husband asking

2    Neil to let him go, and Neil wasn't responding.  He

3    was still holding my father in the trunk, and

4    that's as -- at that point, Clyde approached them,

5    he wrapped his arms around Neil, probably chest

6    length, and just pulled him away from Daddy, and it

7    -- Neil very easily spun around, put the handcuffs

8    on Clyde, and threw him in the trunk on top of my

9    father.

10        Q.    Clyde is your husband, right?

11        A.    Yes.

12        Q.    Just so we're clear -- okay -- all

13    right -- now, you left out the part about the cane

14    hitting Officer Pittman.  You already told me about

15    that before, so I need to figure out --

16        A.    If that was in the --

17        Q.    -- about where the sequence of events

18    occurred?

19        A.    In the struggle.

20        Q.    In the struggle over control of the

21    cane?

22        A.    Yes -- but I -- I do want to say it

23    was not a swing.  It -- they were both holding the

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 83

1      it like you would a dog.

2            Q.      Okay -- is that what you did?

3            A.      Yes.

4            Q.      And -- and you were able to do that?

5            A.      Yes -- against Neil Pittman's will.

6            Q.      How were you able to do it against

7      his will?

8            A.      He was threatening me and swung the

9      cane and hit the car, screaming at me to get away.

10           Q.      But you did -- you were able to do it

11     anyway?

12           A.      Yes.

13           Q.      So he didn't physically prevent you

14     from doing it?

15           A.      He never touched me, no --

16           Q.      Okay.

17           A.      But he told me he was going to arrest

18     me.

19           Q.      Did he arrest you?

20           A.      No.

21           Q.      The only people that Officer Pittman

22     touched were your father and your husband?

23           A.      Yes.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 101

1  throat.

2       Q.     Both hands or one hand?

3       A.     You've got to remember I am

4  constantly going.  I didn't stop.

5       Q.     You saw one hand or both hands?

6       A.     Both hands.

7       Q.     And what was he doing?

8       A.     It appeared that he was choking him,

9  but I believe he was holding him.

10      Q.     Like holding his chest down at that

11 area?

12      A.     Well, from like around his throat.

13      Q.     Just beneath his throat at the upper

14 breast area, holding him in the trunk?

15      A.     No, around his throat.

16      Q.     Okay -- you don't think he was

17 choking him out, you think he was just holding him

18 down in the trunk --

19      A.     I can't say.

20      Q.     -- based on what you saw?

21      A.     My father was unconscious as I

22 approached the vehicle.  I don't know if Neil

23 Pittman did that or the seizure did that.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 151

1      Q.     Yes -- yes.

2      A.     I feel like I was put in a dangerous

3    situation without being given a choice.

4      Q.     You are talking about the officers

5    telling you to drive, or Officer Snow telling you

6    to drive?

7      A.     Yes -- not giving me a chance not to.

8      Q.     All right -- and that was something

9    that Officer Snow did intentionally, right, it

10   wasn't an accident?  I mean, he specifically

11   ordered you to drive, right?

12     A.     Yes.

13     Q.     That was an intentional statement?

14     A.     Yes.

15     Q.     Officer Snow intended to make you

16   drive for him?

17     A.     Yes.

18     Q.     And he knew you were in the car?

19     A.     Yes.

20     Q.     He knew your sister was in the car?

21     A.     Yes.

22     Q.     It wasn't a situation where he took a

23   car and you just happened to be in there, but he